[Civ. No. 26472. Second Dist., Div. Two. Apr. 23, 1963.]

A. R. BELLERUE, M.D., Plaintiff and Respondent, v. BUSINESS FILES INSTITUTE, INC., et al., Defendants and Appellants.

James A. Poore for Defendants and Appellants.

Leonard B. Hankins for Plaintiff and Respondent.

HERNDON, J.—This appeal is taken from a judgment rendered pursuant to stipulation against (1) the defendant Business Files Institute, Inc., upon certain promissory notes which it had executed and delivered, and (2) against the defendants Hilliard, Hedden and Creative Management Corpo-

ration, upon the theory that each of the latter was the *alter ego* of the defendant Business Files Institute in the transaction wherein the said notes were given. In the interest of brevity, the two corporate defendants hereinafter will be referred to as "BFI" and "CMC," respectively.

Since no defense was offered with reference to that portion of plaintiff's complaint which was directed against defendant BFI upon its notes, and since judgment was entered against it by stipulation, manifestly, the judgment against it must be affirmed. Actually, appellants have raised no objection to this portion of the judgment; their appeal is directed entirely against the portion of the judgment rendered against the other named defendants. The decision of this appeal requires that we consider the following determinative question:

Whether plaintiff and respondent may be permitted to recover from certain of his fellow investors in a corporate enterprise by way of an action upon promissory notes issued to him by the corporation to evidence his investment therein, when he alleges in his complaint that each of the other defendants is the *alter ego* of said corporation, but where the evidence conclusively establishes the following facts:

(1) That plaintiff had contracted to purchase stock of the corporation under an agreement by the terms of which he undertook to make an additional investment in the enterprise in the form of a loan to the corporation; (2) that plaintiff participated actively in the management of the corporation, both as a director and as a stockholder; and (3) that in a previous action brought against these same defendants, and others, plaintiff had failed in his attempt to rescind his said agreement and to recover these same investments on the basis of his averments that said defendants had been in possession of superior knowledge concerning the enterprise and had induced him to make his investments therein by false statements.

Stated as briefly as the history of this complex subject matter will permit, the record indicates that early in 1957 defendant Hedden, who might appropriately be styled a "business promoter," and defendant Hilliard, a practicing physician, formed defendant CMC for the purpose of seeking prospects of profitable investments in various business activities. In conformity with a permit issued by the Commissioner of Corporations, 100 shares of CMC stock were sold at $10 per share. Defendant Hilliard paid the consideration of $1,000,

but 49 shares were issued to Hilliard, 49 shares to Hedden and 2 shares to a party not identified by the record.

One of the more promising business activities considered was the development of a catalogue in the field of office equipment and supplies. Defendant BFI was formed to handle this venture, and it issued 100 shares of its stock to CMC for $1,000. It appears to have been the intention of the two individual defendants that these corporations would operate with money to be "loaned" to CMC by Dr. Hilliard, and then to be advanced by CMC to BFI. It was agreed that for his full-time services, Hedden would receive only a "subsistence payment" and that the additional value of his services would constitute the consideration for the stock ownership arrangement.

By the end of 1957, as the prospects for the successful development of the catalogue improved, a very substantial amount of the time and money of these defendants was being devoted to this project. However, during this period and in the early part of 1958, it became increasingly apparent that additional capital and services would be required in order to complete the project. Therefore, it was decided that others would be brought into the venture on a basis consistent with that adopted by the original investors. That is, certain of the new members would render their services in return for "subsistence payments" and the transfer to them of some of the BFI stock then being held by CMC. Others would make "loans" to BFI and purchase its stock from CMC at its nominal value, in the same fashion as Hedden and Dr. Hilliard had done in bringing the project to its then promising, but inchoate, state.

Those brought into the venture on a basis like that of Hedden were Rudolf Lang, who was to operate the New York office of BFI, and Wayne Marsh, an occasional employee of plaintiff and who formerly had served as plaintiff's office manager. On March 4, 1958, the bylaws of BFI were amended to increase the number of directors and Lang and Marsh were thereupon elected to the board. At this meeting, the board approved the issuance by BFI of a total of 36 two-year notes totaling $45,000 in amount. These notes were to be issued to CMC in consideration for the money and services theretofore provided during the organization and development of the project by defendants Hedden and Hilliard, acting through CMC. The earliest maturity date of any of these notes was June 20, 1959, and the latest was February 28, 1960.

Those brought into the organization on the same basis as Dr. Hilliard included plaintiff Bellerue, who also is a practicing physician, Sam Bevis and John Rudbach. Their agreements provided that they would lend certain sums to BFI and, simultaneously, purchase its shares from CMC at its nominal value of $10 per share. Plaintiff's agreement required him to lend $10,000 to BFI in accordance with the following schedule: $500 at the time the agreement was made; $2,000 on May 1; $2,000 on June 1; $1,500 on July 1; $1,500 on August 1; $1,500 on September 1; and $1,000 on October 1, 1958.

Contemporaneously with each of the above payments, plaintiff was to pay the further sum of $10 to CMC, for which he would receive 7½ shares of BFI stock. In accordance with this agreement, plaintiff paid $7,500 to BFI and received its two-year notes aggregating $7,000. Receipt of an additional $500 was acknowledged, although for some reason a note apparently was not issued therefor. He also paid $65 to CMC on account of the stated price of $75 for his 7½ shares of BFI stock.

Sam Bevis' agreement bound him to a "loan commitment" of $5,000. By July of 1958, he had paid $2,500 to BFI and $20 to CMC. Bevis was not made a party to any of the legal actions instituted by plaintiff, and the evidence does not disclose whether or not he was satisfied with his role in the venture. John Rudbach's commitment also was $5,000, but apparently nothing was paid thereon.

On May 1, 1958, another meeting of the shareholders of BFI was held and the bylaws were again amended to increase the number of directors and plaintiff Bellerue, together with Bevis and Rudbach, were elected to the new directorships. The minutes of all these board meetings were received in evidence. The minutes of the meeting of March 4, 1958, were read at the meeting of May 1, 1958, at which plaintiff was in attendance. From this it clearly appears that plaintiff necessarily was informed of BFI's $45,000 indebtedness to CMC which was disclosed by the minutes of the previous meeting.

On July 15, 1958, another shareholders' meeting was held. All the participants in the venture appear to have been in attendance. The minutes of this meeting indicate that the same seven-man board (including plaintiff) was reelected and that plaintiff's wife, who also was present, was nominated as a director but declined the nomination. The minutes of the meeting of the board of directors of the same date reflect that

plaintiff nominated defendant Hedden for chairman of the board and that his election followed. The minutes of these formal meetings indicate that the business activities and the financial affairs of the corporation was discussed in detail and at length at each meeting.

In addition to the minutes of the formal meetings, plaintiff testified: "Q. At any of the meetings you attended did you hear anything discussed about finances? A. Most of it was this: That they said they *needed the money to pay the salaries of people, their rent and various offices expenses.* Q. Did they tell you that they had no income? A. Not that I remember of. I was given the impression all the way through that this was a perfectly sound organization, *that the money I was paying in was for current expenses.* Q. Were you told at any time that there was no income coming into the corporations? A. I don't think so. Q. Were you told that the corporations had one product, namely, a catalogue? A. Yes, I probably was told that *there was no income coming in because there was no product on the market.*" (Italics added.)

Plaintiff also testified: that he had been introduced to the venture by his employee, Marsh, who had told him ". . . it was a good proposition that he had in mind that . . . I would be interested in because it was an opportunity to make a lot of money . . ."; and that the defendants had mentioned to him "the possibilities of the future" and had assured him "that this thing was going to be a topnotch thing, that inside a short time it would be worth at least a million dollars."

Plaintiff admitted also that he had introduced the other board members to a doctor friend who practiced in Compton and that plaintiff had attended a luncheon meeting at which an attempt had been made to induce the friend to invest in the venture on a basis similar to that of plaintiff. The remainder of plaintiff's testimony may be fairly summarized by stating that, despite the foregoing admissions and the contrary proof contained in his own exhibits, he declared his total ignorance of the activities and financial condition of the corporation.

Such evidence as is contained in the record regarding the progress of the enterprise indicates that arrangements had been made to issue a limited edition of the catalogue for use at the National Business Show in New York in October 1958, in lieu of the catalogue formerly produced by the managers of this show. It was contemplated that at that time an attempt would be made to sign up all of the various manufac-

turers of office equipment and thereby complete arrangements for the production of the complete catalogue as planned. In addition, some 200 orders to purchase the planned catalogue at $150 per set had been received. A few of these were accompanied by checks which were returned because the product was not yet available.

. At this juncture, for reasons not entirely clear in the light of the conflicting evidence, plaintiff consulted an attorney who, in plaintiff's presence, examined the books and records of the company. Thereafter, on August 25, 1958, three letters, all apparently prepared by plaintiff's counsel, were sent to BFI and its officers. One letter signed by plaintiff tendered his resignation as director. Another also signed by him read in part:

"Without knowing all the facts concerning Business Files Institute, Inc., and Creative Management Corporation, *I purchased certain stock of Business Files Institute, Inc.,* supposedly owned at the time by Creative Management Corporation, *on condition that I make certain loans to Business Files Institute, Inc.* I have had my Attorney, Leonard B. Hankins of 4014 Long Beach Blvd., Long Beach, California investigate the corporation and its stock permits and financial condition and as a result of his examination and recommendations I forthwith demand from you individually and/or jointly the entire sums which have been paid to you to date. *I hereby tender back to you all the stock, notes, etc., which you have turned over to me which I shall give to you at the time you return to me all the monies which I have previously paid to Business Files Institute, Inc., and/or Creative Management Corporation and/or any of the above addressed individuals."* (Italics added.)

The third letter was signed by plaintiff's attorney, and, after referring to the other two letters, stated: "Dr. Bellerue has authorized me to proceed with whatever action necessary in order to enforce his legal rights in connection with this matter. I shall appreciate your giving this your immediate attention and I will withhold any other action for a period of ten days awaiting your reply."

Subsequently, there were other discussions among the interested parties, which are the subject of much conflicting testimony, but they resulted in no agreement. Plaintiff paid in no further money under his agreement, and the corporation apparently was unwilling or unable to proceed further with its plans under the existing circumstances. Appellants

asserted that the business then failed because plaintiff's breach of his agreement resulted in there being no funds available to proceed with the New York show upon which the culmination of the project hinged. However, regardless of this assertion, it is undisputed that neither plaintiff nor Dr. Hilliard received repayment of any of the money which they put into the venture by way of loans or otherwise and that none of the other parties received anything due for salaries or for services rendered.

On January 7, 1959, plaintiff filed a verified complaint in four counts. This complaint was amended on February 17, 1959. The first count set forth the above described agreement in relation to the loans and purchase of stock to be made by plaintiff and alleged that this transaction constituted a sale, or an offer to sell, or an attempt to sell, corporation securities in violation of the provisions of the Corporations Code, in that no permit had been issued by the Commissioner of Corporations, with the result that the transaction was void and that plaintiff was entitled to a judgment for the monies paid by him. The second count alleged that Hedden, Marsh, Dr. Hilliard, and Lang "had actual knowledge of and directly participated" in the transaction, and that plaintiff therefore was entitled to judgment against them individually. In the third count, plaintiff declared his election to rescind his agreement on the grounds disclosed by the facts alleged in the first count and sought a return of his money.

The fourth count alleged that the defendants had deceived and defrauded plaintiff by misrepresenting (1) that they had a permit to issue the stock and the notes; (2) that BFI possessed valuable copyrights; (3) that BFI had contracts for the sale of its products; (4) that BFI was in good financial condition; (5) that BFI owed no obligations except its current operating expenses; (6) that BFI "would make sufficient profits to return the original investment within one year"; (7) that BFI was a "National Corporation" and; (8) "that the moneys put into the investment program of BFI by the investors was insured, whereas all said representations were false and known to the said defendants and each of them to be false."

Defendants' answer to the amended complaint admitted the transaction involving the loans and sale of stock, but denied that it was void and further alleged that plaintiff was an officer and director of BFI and had participated actively in the affairs of both corporations. Answering the fourth cause of

action, defendants denied making any false representations and affirmatively alleged that plaintiff had participated in all the affairs of the corporation and that only because of his failure to perform his agreement, the corporation had been prevented from making a profit.

A nonjury trial resulted in a decision in favor of defendants. A minute order, dated September 22, 1960, awarded judgment to defendants and directed their counsel to prepare the findings of fact, conclusions of law and judgment. These documents, together with objections thereto, were filed on November 25, 1960. However, for some unexplained reason, nothing further was done in the case until January 5, 1962, when the objections to the findings were argued. The findings were signed by the trial judge on February 15, 1962. The judgment was signed on March 21st, and entered on March 27, 1962. An appeal from that judgment is now pending in another division of this court.

The findings above mentioned determined that "plaintiff A. R. Bellerue, was a director in the corporation known as Business Files Institute, Inc., and in that capacity aided in the attempts to borrow money from outside sources and also took an active part in the various activities of both Business Files Institute, Inc., and Creative Management, Inc. . . ."; that the stock in the corporations had been validly issued; that no sale of stock or other securities had occurred, but that plaintiff had paid CMC $65 "for seven and one-half (7½) shares of Business Files Institute, Inc., stock, which sale was never consummated, but was conditioned upon further approval by the Corporations Commissioner of the State of California"; that the $7,565 which plaintiff paid to BFI in the form of a loan "did not constitute the sale or an issuance of stock of either corporation."

It was further found: "That at all times during the existence of business relations between A. R. Bellerue and the defendants, A. R. Bellerue was fully advised as to the exact nature of the business, the financial condition of the business, and the purposes of the business and that he had access to the books of both of the corporate defendants at any time had he desired to look. . . . That there was no intent on the part of any of the defendants to mislead and deceive plaintiff, A. R. Bellerue, and that A. R. Bellerue did not rely upon any representation of any of the defendants as to the business financial matters, but was, on the contrary, well advised and informed at all times."

Following the entry of the minute order awarding judgment to the defendants on September 22, 1960, as above recited, plaintiff commenced the present action on October 25, 1960. The defendants in the instant action are BFI, which is sued upon the notes above described, and CMC, Hedden and Dr. Hilliard, who are sought to be held by allegations designed to "pierce the corporate veil." That is, it is alleged that BFI was controlled by the other named defendants and used by them to conduct their own personal business affairs; that its invested capital was nominal and insufficient; that the defendants had caused it to incur debts in excess of $70,000, knowing that it was insolvent and unable to pay its debts as they became due; that they maintained inadequate records; and that to continue to recognize its separate existence would work a fraud and an injustice upon plaintiff.

As previously indicated, no attempt was made on behalf of BFI, such as that which was made in the prior action, to defend on the ground that it was plaintiff's own failure to perform his agreement that had resulted in the inability of BFI to complete its planned program successfully. Since it had been determined in the first action that plaintiff was not entitled to any legal or equitable relief, either by way of rescission or otherwise, such a defense would appear to present a justiciable issue, but presumably by virtue of its inactive and insolvent state, no such issue was presented in the instant action.

Dr. Hilliard, Hedden and CMC defended the instant action on essentially the same grounds which they had urged with success in the prior action. That is, they denied generally the allegations of the asserted facts relating to the "piercing of the corporate veil" and affirmatively alleged: "That during all times mentioned in plaintiff's complaint, plaintiff was a director in Business Files Institute, Inc. and actively participated in the affairs of both Business Files Institute, Inc. and Creative Management, Inc. and that any financial difficulties encountered by said corporations were equally the results of the activity of defendants and plaintiff."

In the present action, these defendants also interposed an affirmative defense to the cause of action relating to their individual liability alleging: "That the conditions set forth in plaintiff's seventh cause of action have been previously litigated in action No. 714754 in the Superior Court of the

State of California, in and for the County of Los Angeles, and that the findings of said Court are conclusive."

From the findings above quoted, it is apparent that such a defense could have been meritorious. Even if it be assumed that the legal theories implicit in plaintiff's two complaints were not mutually exclusive on their face, the *facts* found to be true in the first action certainly would constitute a complete defense to his claim based upon the *alter ego* theory.

 While conceivably a stranger to a corporation might unsuccessfully prosecute an action against the corporation and its officers and directors seeking to rescind a loan agreement made with it on the theory that the Corporate Securities Law had been violated, or that he had been personally defrauded, and, after such unsuccessful action, then bring suit upon the notes themselves and seek to pierce the corporate veil, surely one who has been found to have been a director of the corporation and who actively engaged in its activities with full knowledge of its financial condition, should not be permitted to proceed in this fashion. (See *Lynch* v. *McDonald*, 155 Cal. 704, 706 [102 P. 918].)

 One who unsuccessfully has sought to recover from his associates what he himself concedes to have been an investment in a joint venture, on the theory that they have taken unfair advantage of him, should not be heard thereafter to assert that he was no more than an ordinary creditor and otherwise a stranger to the transaction.

Regrettably, at least from the standpoint of the additional time and expense devoted to this aspect of plaintiff's second action, the defendants apparently failed for more than a year to discover that the judgment awarded on September 22, 1960, and the findings in support thereof upon which they relied, had not been signed and filed. Therefore, when the second action came on for trial on November 8, 1961, the prior action did not constitute a final and conclusive adjudication of the validity of the defenses pleaded in defendants' answer. Actually, the judgment in the prior action is still not final, for an appeal has been taken therefrom and "[a]n action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied." (Code Civ. Proc., § 1049.)

At this late stage, defendants moved for leave to amend their answer by striking the defense of res judicata previously pleaded and sought permission to file a demurrer to the com-

plaint on the ground that another action was pending between the same parties for the same cause. (See Code Civ. Proc., § 430, subd. 3.)

■ Although courts should be liberal in allowing amendments, the decision in any particular case lies within the discretion of the trial court. (*Dos Pueblos Ranch & Improv. Co.* v. *Ellis*, 8 Cal.2d 617, 622 [67 P.2d 340].) The problem of the trial judge in the instant case was additionally complicated by the fact that it was stipulated that judgment be rendered on the first six counts as against BFI despite the pendency of the prior action. Finally, it appears that the trial judge, in ruling on defendants' motion for leave to amend made near the beginning of the second trial, merely stated, "I deny the motion as of now." It does not appear that the motion was renewed thereafter, and, in view of our disposition of the other errors assigned, we need not determine whether the apparently tentative denial of the motion constituted an abuse of discretion.

Although a finding was made that Dr. Hilliard and Hedden knew BFI was insolvent and unable to pay its debts as they became due, the record is totally devoid of evidence tending to prove either the existence or the amount of any due but unpaid corporate debts. The books and records introduced by plaintiff fail to disclose the existence of any unpaid creditors other than the joint venturers, themselves, and, of course, these were not in any true sense current obligations. Further, no finding was made to the effect that defendants had any greater knowledge of the material facts than did plaintiff.

Plaintiff himself testified that he knew that his investment in the business was desired in order to provide money necessary to meet current operating expenses until the product could be marketed. Even if plaintiff's asserted ignorance of the financial structure of the business were accepted at face value, which the trial judge by his comments clearly expressed his refusal to do, in view of the conflicting evidence contained in his own exhibits and in the testimony of the defendants, the fact remains that the question as to the indebtedness of $45,000 owing from BFI to CMC was not then an issue, because the first payment thereon was not due until 14 months after plaintiff joined the venture and 11 months after he had decided to discontinue performance under his agreement.

In 27 California Jurisprudence 2d, Insolvency, section 2, pages 500-501, it is stated: "The test question is said to be not, 'Will his effects realize enough to pay his debts due and

to become due?' but rather, 'Are his affairs in such a condition as to enable him, in the usual and ordinary course of his business, to make his payments as they fall due?'" The present record contains no evidence whatsoever tending to prove that this concededly speculative venture would have failed to meet its debts and realize a profit for its investors had it not been disrupted by plaintiff's decision to refuse to perform his agreement and to commence legal action against his associates.

There is a finding that BFI was undercapitalized and that it "should have been capitalized for in excess of $40,000." The only basis for such a finding is an assumption that every corporate venture must at the outset be in possession of capital at least equal to the total estimated amount required to consummate its project before it properly can undertake the preparatory stages of the venture. Or, stated in another way, the suggestion seems to be that a corporation may not undertake to acquire additional working capital by borrowing unless it already is in possession of funds sufficient to launch the project it was formed to develop. Less dramatically expressed, there might be some possible merit in such a requirement in a case involving the interest of one who is merely a creditor rather than one who concededly has invested in the enterprise upon the expectation that "further possibilities" might make the venture "worth at least a million dollars." (See 1 Ballantine & Sterling, California Corporation Laws (4th ed. 1962) § 96.02, p. 190, discussing the tax advantages that lead to the formation of "thin corporations.")

No finding is made that the plaintiff was unaware of the "undercapitalized" state of the corporation, nor would such a finding have been supported by the evidence. Looking only to the testimony of the plaintiff, it is apparent that he knew that he, Bevis, and Rudbach were placing "capital" in the venture in the "form of loans" in the same fashion that Dr. Hilliard had done.

A conclusion, in the *form* of a finding, states that Dr. Hilliard, Hedden and CMC "are the alter ego" of BFI. ▇ "The figurative terminology 'alter ego' and 'disregard of the corporate entity' is generally used to refer to the various situations that are an abuse of the corporate privilege." (*Minton* v. *Cavaney,* 56 Cal.2d 576, 579 [15 Cal.Rptr. 641, 364 P.2d 473].) ▇ A mere statement of the ultimate legal issue to be determined in "figurative terminology" is not an appropriate finding of fact.

▓ "It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances in each case." (*Automotriz etc. De California v. Resnick*, 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042].) Of the many factors that have been considered by the courts in determining whether or not an abuse of corporate privilege has occurred in the particular situations before them, it is apparent that only the factor of "undercapitalization" is suggested here.[1]

No finding was made, nor was there any evidence tending to prove, that any of the individual defendants used either of the corporations for the transaction of their personal affairs.

---

[1] At the conclusion of the instant case, the trial judge stated: "I am not able to make an ultimate conclusion in this matter at this moment. I shall submit it, particularly on this question of the corporate financing.

"I don't think this is a case of fraud. I think that from the doctor's own testimony, in which he said among other things that he knew that the money derived from the loans was to be used to pay the current expenses, we have a key to the approach to this matter. I don't think anyone connected with it had any illusions about the nature of the enterprise or the necessity of proceeding to a certain point of development before it could actually be crystallized into a going operation, I think it had some of the elements of a corporation that incorporators form for the purpose of drilling for oil. They have to finance a well and they have to put it down, and they believe when they reach the strata they will get the oil.

"Intrinsically, I think that in this case the whole project was bona fide. I believe that intrinsically the thing that these men set out to do was a bona fide enterprise with considerable merit. Obviously, it is an enterprise which requires time, contacts and a great deal of work to bring to fruition. The existence in this field of other types of trade catalogues used by purchasing agents is an established fact. It was mentioned that there was one which related to building materials, devices, and the rest of that. In other litigation I have been privileged to see that particular type of development.

"I can't believe that in the course of these proceedings the doctor didn't have an idea of the state of the business which was fairly adequate. In proceeding into these enterprises men can advance their money usually in two ways, one of which is to purchase stock directly, and very frequently even the organizers of enterprises of this sort cover their initial investment by notes in the hope that when the undertaking proceeds to a certain extent they can then decide whether they want to put it into the capital directly or whether they want to take it out and consider the redisposition of it. I have had a whole series of corporate cases where the promoters of enterprises, some good and some bad, have done that very thing, maintaining a small stock issue as the basis of their corporate existence.

"I find nothing in this case to indicate that the organization of the corporations was not bona fide and that it did not continue to be bona fide. We have a lot fuller record at least in one corporation, the B.F.I., here than we did in many of these concerns such as the late tortilla factory that I saw go by here and other enterprises of a promotional nature which have come to sorry days and shipwreck.

"*I think with those elements stripped out of the picture we come right down to the question of whether this matter of undercapitalization,*"

Defendant Hilliard, like plaintiff Bellerue, was a practicing physician. No finding was made, nor was there any evidence, that the books and records of the corporation were false, inadequate or incomplete.

No finding was made, nor was there any evidence, that any stock had been issued unlawfully. In fact, plaintiff admittedly invested in the company by purchasing shares of stock therein, and although he did not fulfill his agreement and although the stock never was actually issued to him, he was treated as a stockholder and conducted himself as such at the several stockholders' meetings to which we have alluded. No finding was made, nor was any evidence introduced tending to prove, that there was such a unity of ownership and control as to require that the separate entities of the corporation and of the individual defendants should be disregarded. Defendants constituted a minority of two on the seven-man board of directors on which plaintiff, Rudbach and Bevis, who were similarly situated investors, played an active role.

That it was the issue of inadequate capitalization alone that formed the basis of the judgment rendered herein is clearly reflected in the comments of the trial judge at the time the matter was taken under submission. Having stated the legal conclusion as to plaintiff's *alter ego* theory by way of a "finding," the next and concluding "finding" on this issue is the further conclusional statement: "That it would be a fraud and injustice to allow the individual defendants, George Hedden, Jr. and John W. Hilliard, M.D. to escape liability as individuals behind such an inadequate capital structure as provided by them for Creative Management Corporation and Business Files Institute, Inc."

No facts are stated in the findings nor is there any evidence to support such a conclusion. Perhaps it could be argued with some logic that a third-party creditor of BFI should be permitted "to raise the corporate veil" of this "undercapitalized" venture, but if such a creditor were allowed so to do, plaintiff would be disclosed to unfavorable view as well as defendants, for admittedly he invested in the venture and became the owner at least of an equitable interest therein. If plaintiff is

*per se, in the presence of liabilities which existed to the doctor and also which existed to one of the other corporators allow or demand that the corporate veil be pierced and the individual stockholders be held responsible as if they were partners or joint venturers.* That is the point that I am not ready to determine from this whole record. I want to read the cases, and I want to read some of the exhibits and the business records." (Italics added.)

allowed to lift the veil, the scene thereby disclosed reveals that this is not an action upon corporate promissory notes, but in substance a repetition of plaintiff's first action wherein he attempted to recover his investment in the business upon the theory that his associates had misled and deceived him. This question will be settled upon the determination of the appeal in the first case. It provides no justification for allowing plaintiff, by invoking the *alter ego* principle, to relitigate the issues and thus indirectly to shift the loss resulting from the failure of the business to his associates.

Although findings were made as to defendants' other affirmative defenses of laches and the asserted bar of the former judgment, as above discussed, no finding was made upon the issues tendered by the affirmative defense wherein it was alleged, in substance, that plaintiff was a director of the corporation and actively participated in its affairs, and that any financial difficulties encountered by the corporation resulted as much from the actions of plaintiff as from those of the defendants. There is a general finding to the effect that "each and every other allegation or denial contained in the answer of defendants that is inconsistent with the foregoing is not true." Even if we were to assume that this finding related to defendants' last mentioned affirmative defense, rather than to their answer to plaintiff's complaint, it still would not assist plaintiff, for the "foregoing" contained no findings on these factual matters, inconsistent or otherwise. Further, it is apparent from the record, and from the comments of the trial court, that if findings had been made thereon, they would and should have been favorable to this asserted defense.

In fact, the only evidence even remotely tending to contradict findings favorable to such defense was plaintiff's assertion that he became a director of the corporation only because defendants insisted that he do so. ██ "It is immaterial whether or not he accepted the office of director as an 'accommodation' with the understanding that he would not exercise any of the duties of a director. A person may not in this manner divorce the responsibilities of a director from the statutory duties and powers of that office." (*Minton* v. *Cavaney, supra,* 56 Cal.2d 576, 580.)

All the cases discussing the "*alter ego*" theory make clear that, in addition to various requirements designed to establish a unity of interest and ownership which blurs the separate personalities of the corporation and its shareholders, it must be shown that an inequitable result will follow if the acts of

the corporation be not regarded as the acts of the individuals. In *Does Pueblos Ranch & Improv. Co.* v. *Ellis, supra,* 8 Cal. 2d 617, 621, the court quoted the following from *Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 P. 641] at page 11:

" 'In order to cast aside the legal fiction of distinct corporate existence as distinguished from those who own its capital stock, it is not enough that it is so organized and controlled and its affairs so managed as to make it "merely an instrumentality, conduit, or adjunct" of its stockholders, but it must further appear that they are the "business conduits and *alter ego* of one another," and that to recognize their separate entities would aid the consummation of a wrong. . . .' " (See also *Riddle* v. *Leuschncr,* 51 Cal.2d 574, 582 [335 P.2d 107].)

Since there is no denial of plaintiff's knowledge that defendant Hilliard was a practicing physician who had invested in the venture in the same fashion that plaintiff himself had done, it is difficult to see how the corporation was any more the *alter ego* of one than of the other. We fail to see how justice would be served by requiring Dr. Hilliard to bear plaintiff's $7,500 loss in addition to his own individual loss of approximately $23,000. "The corporate veil may at times be pierced to do equity and justice, but never to accomplish the reverse." (*Talbot* v. *Fresno-Pacific Corp.,* 181 Cal.App.2d 425, 432 [5 Cal.Rptr. 361].) Any rights that plaintiff may have as against these defendants may be determined in his prior action, which, as we have stated, is now pending on appeal.

The judgment is affirmed as to Business Files Institute, Inc., and reversed as to appellants Creative Management Corporation, Hilliard and Hedden. The last named appellants are awarded their costs.

Fox, P. J., concurred.

Ashburn, J., concurred in the judgment.