[Civ. No. 19969.   First Dist., Div. Two.   Jan. 15, 1962.]

CLAIR GOLDSMITH, Plaintiff and Respondent, v. TUB-O-WASH et al., Defendants and Appellants.

Hersh & Hadfield for Defendants and Appellants.

C. Wadsworth White and S. V. O. Prichard for Plaintiff and Respondent.

KAUFMAN, P. J.—On March 17, 1958, the parties executed a written lease whereby the plaintiff, Clair Goldsmith, leased to the defendant, Tub-O-Wash, a California corporation, the entire ground floor of a building at 4300 Grove Street, in Oakland, and the adjacent parking lot. The lease was for a term of five years, commencing April 1, 1958, at a total rental of $6,000. As there was a rental residence apartment located above the rear portion of the leased premises, the plaintiff reserved to her own use the "exterior wall and roof of the demised premises."

On November 9, 1959, plaintiff filed her first amended complaint in this action against defendants, for money due under the written lease, for damages for breach of contract and for declaratory relief. Defendants answered denying liability under the lease and breach thereof, and cross-complained for damages resulting from the plaintiff's breach. The trial court denied defendants' motion for a judgment on the pleadings, and after a trial without a jury, entered judgment for the plaintiff. Defendants appeal from the judgment, contending that the facts as found by the court do not support the judgment and that the court erred in denying their motion for a judgment on the pleadings. There is no merit in either contention.

At the time of the execution of the lease, the demised premises had been used as a bar. Defendants wished to con-

vert them for use as a self-service launderette. They took possession of the premises on April 1, 1958. A few days before, City Building Inspector Clifford Dameral inspected the premises, advised the plaintiff of certain building defects needing correction, and requested that plans and applications for the same be submitted to the city. At this time, because of the necessity of converting the premises to the contemplated use, the defendants were in contact with the city building department. On April 7, 1958, they submitted an application for a building permit, together with a plan containing specifications for the necessary remodeling work. The building permit was granted on April 8, 1958, and shortly thereafter, the defendants began the remodeling and preliminary work with their contractors. Thus, the defendants dismantled and disposed of a 30-foot bar with 18 stools, the back bar with mirrors, a sink, 2 refrigerators, a circulating heater, as well as certain ceiling fixtures; they also ripped up and removed a portion of the flooring, sawed off and removed four beams and studdings, removed the linoleum flooring, cut off and removed the plumbing and ripped off the back and sidewalls.

Subsequently, Inspector Dameral again inspected the premises and found that certain work not specified in the building permit would have to be performed before a license for the operation of the contemplated business could be granted. When the inspector discussed this matter with the defendants' contractors, the latter ceased work immediately. About April 10, defendant Hersh told the plaintiff's building manager, John Grossman, of Inspector Dameral's findings. Grossman stated that the plaintiff would do the required structural work affecting the exterior walls of the demised premises, as well as a part of the necessary replacement of the foundation and would bring the remainder of the building up to the code standards. When defendants' broker, Marks, apprised them of this, Hersh stated that they did not wish to go through with the deal.

On April 18, 1958, the supervising building inspector sent a letter to the plaintiff stating that in addition to the corrective steps being undertaken under the building permit issued to defendants for the work described therein, the following corrections were also necessary: (1) repair of the front stairs, porch and handrail to the upstairs rental residence; (2) the placement of a supporting beam under the rear porch of the upstairs rental residence; (3) the removal of about one foot of dirt piled against the north foundation wall; and (4) the

replacement of approximately 14 feet of the foundation on the south [43d Street] side of the building toward the rear [east]. All of these repairs concerned those portions of the plaintiff's building which were not a part of the premises demised to the defendants.

Defendants received a copy of this letter. About that same time, Inspector Dameral met with Marks and Sylvan Hersh (representing the defendants). Dameral stated that the above-mentioned work would have to be completed. Defendants, through Sylvan Hersh, agreed and stated that they would do this work. However, the defendants did not proceed with the work at all but rather indicated to Marks that they did not wish to go through with the deal and would not, under any circumstances, commence the work until the plaintiff had first completed the work agreed to be done by her.

Thereafter, on June 25, 1958, plaintiff sent a letter to the defendants demanding that the premises be restored to the original condition or that the defendants immediately proceed with the work of remodeling, obtaining licenses and opening for business. Defendants did neither of these things, but in September 1958, forwarded a letter to the plaintiff offering to continue their work of alteration and repair if the plaintiff would first perform all of her agreed-upon work in curing the structural defects. Plaintiff replied that this was satisfactory and agreed to do the work provided the defendants performed first. The defendants refused to proceed and on September 30, 1958, abandoned the project entirely. The court found that the above-mentioned requirement on the part of plaintiff was reasonable under the circumstances, and that if the defendants had intended to proceed to do the corrective work which they were obliged to do under the terms of the lease and to procure the necessary permits therefor, they could have obtained the necessary permits by approximately April 15, 1958, and could have completed the remodeling and corrective work by approximately June 15, 1958, and could have commenced doing business by that date.

After September 1958, plaintiff made some attempts to sell or lease the property by listing with realtors. The court found that approximately by December 1958, plaintiff should have known that the defendants would not proceed with their lease obligations to remodel or restore; that the building and store could not be sold or leased in the torn-up condition and that they should have been restored in order to make the premises rentable or saleable in order to mitigate damages by approxi-

mately December 31, 1958. The court found the cost of restoring the premises to the condition in which it was at the commencement of the work done by defendants to be $1,000 and that the sum of $900 was a reasonable attorney's fee.

The court further found that as to the counterclaim and cross-complaint, the defendants were not prevented from performance of the lease obligations by any action or conduct of the plaintiff; that the additional building department requirements of repairs required were requirements for repairs to areas of the building which were not part of the "demised premises"; that paragraph 30 of the lease[1] applied and pertained to the "demised premises" *only*; and that paragraph 7 of said lease pertaining to acceptance by lessee of the demised premises in good condition and agreement to repair any defects, etc., applied and pertained to the "demised premises" *only*; that, therefore, under the circumstances, it was reasonable for the plaintiff to tell the defendants that she would not proceed with the additional building department requirements and repairs until after the defendants had continued with their remodeling and repair work commenced under said April 8, 1958, building permit; and that it was not reasonable or proper for the defendants to refuse to proceed with their said remodeling and repairs under the April 8, 1958, building permit until the plaintiff proceeded with or completed the additional building department requirements.

The court concluded that the lease of March 17, 1958, was a valid lease, which became effective on the date of its execution and continued in force and effect until terminated on December 31, 1958, by the acts of the parties; that the lease was breached by the defendants' abandonment thereof on September 30, 1958; that thereafter, plaintiff was obligated to mitigate damages therefor; and after approximately 60 days of endeavoring to sell the property or lease the premises, plaintiff should have restored the premises to their former or other useable condition so that the premises would have been more saleable or rentable by January 1, 1959; that under the provisions of the lease, the defendants became obligated to pay the plaintiff the following amounts: $1,000 for the cost of restoring the premises, $650 rental from June 15 to December 31, 1958 [less a credit for their $200 deposit made at the time of the agreement], $900 for the attorney's fees neces-

---

[1] "Lessee agrees to accept the premises in their present condition, to remove all equipment therefrom, and apply the proceeds thereof toward the improvement of the property."

sarily incurred by plaintiff in this action because of defendants' breach of the lease agreement; and, finally, that the defendant, Tub-O-Wash, Inc., was so completely controlled and managed by the defendants Hersh and Barth, that it was in reality a mere business conduit and *alter ego* so that the recognition of the corporation as a separate entity would aid in the consummation of a wrong and injustice on the plaintiff.

As indicated above, the major contention on appeal is that the facts as found by the trial court do not support the judgment and that the trial court erred in its conclusions of law. ██ The first argument is that the trial court erred in its judgment because the plaintiff's refusal to complete the repairs of the undemised portion of the premises constituted a constructive eviction.

Aside from the usual covenants relating to default by the lessee, abandonment, and counsel fees, the lease contained the following provisions concerning repairs: "*7. Repairs: Lessee accepts the demised premises as they now are and agrees that the demised premises are now in good and tenantable condition and Lessee agrees at his own cost and expense to keep the demised premises both inside and out* (save the roof and exterior walls), including the sidewalks adjacent thereto and the glazing and skylights, if any, *in good condition and repair during the term of this lease. Lessee agrees to repair any defects that may hereafter be discovered or arise and to make all repairs, including plumbing and heating that may be necessary, and to make all repairs to the demised premises and appurtenances and repairs to or replacement of glazing as the necessity therefor exists, especially waiving all rights to make repairs at the expense of the Lessor as provided for in Section 1941 and 1942 of the Civil Code of the State of California,* or any amendment thereof or other statute or law which may be hereafter passed by the State of California during the term of this lease authorizing the tenant to make repairs at the expense of his landlord, and agrees upon the expiration of the term of this lease or sooner determination hereof to surrender unto the Lessor the demised premises in the same condition as received, ordinary wear and tear excepted. Lessor agrees, after written notice of the necessity therefor, and should the same not be due to the negligence of the Lessee, to make the requisite repairs to the roof and exterior walls, excluding the glazing in said walls and roof. Should the Lessor fail to make any of the repairs assumed

by him hereunder, he shall not be liable to the Lessee, his employees, invitees, or licensees, for any damage to person or property, and the only remedy of the Lessee shall be the performance of said repairs by himself with right of reimbursement from the Lessor of the reasonable value of said repairs, not exceeding the sum actually expended by him. [Italics added.]

". . . . . . . . . . . .

"30. Lessee agrees to accept the premises in their present condition, to remove all equipment therefrom, and apply the proceeds thereof toward the improvement of the property."

The trial court found that paragraph 30 and the first portion of paragraph 7 relating to acceptance by the lessee of the premises and promise to repair, applied only to the "demised premises." Defendants argue that the portion of paragraph 7 relating to the lessor's obligation to repair, is a condition precedent to their obligation to pay rent. We cannot agree. Covenants in leases are held to be mutually independent unless the lease expressly or impliedly makes them conditional (3 Williston on Contracts, p. 2520; *Enos* v. *Foster,* 155 Cal. App.2d 152 [317 P.2d 670]). There is nothing in the lease in question to indicate that the parties intended to make the plaintiff's covenant to repair a condition precedent for the performance of the defendants' obligation to pay rent (*Ng* v. *Warren,* 79 Cal.App.2d 54, 59 [179 P.2d 41]).

Defendants rely on *Butt* v. *Bertola,* 110 Cal.App.2d 128 [242 P.2d 32], and similar authorities, wherein the landlord's failure to repair the undemised portion of the premises resulted in making the demised premises untenantable. They argue that the instant case is a simple failure of the landlord to live up to her agreement to repair the undemised portion of the premises. Their argument, however, overlooks their own actions in beginning the remodeling and making the demised premises untenantable, as well as the trial court's findings that the plaintiff was willing to take the necessary steps—but that the defendants then decided they did not wish to go through with the deal and their subsequent refusal to proceed with the remodeling until after the plaintiff had completed the repairs of the undemised portion of the premises. From these facts, the trial court properly concluded that the plaintiff's refusal to proceed until after the defendants had continued with their remodeling was reasonable and that the defendants had breached their agreement.

The next argument is that the trial court erred in its conclusion to disregard the corporate entity of ''Tub-O-Wash (Inc.).'' The evidence established that the Tub-O-Wash corporation was formed on February 24, 1958, by the filings of its articles with the Secretary of State. One meeting was held on March 1, 1958. The directors were Barth, Mrs. Barth, who was Hersh's daughter, and Le Roy Hersh, the attorney for the defendants herein, with Barth as president. No actual directors' meeting was held, but minutes of a purported meeting were prepared and signed by Barth at the direction of Sylvan Hersh. Barth did not know in fact whether he was president of the corporation and signed whatever papers were submitted to him by Hersh. A permit to sell shares of stock was obtained in July 1958, and only two shares issued, one to Mr. Barth, one to Mrs. Barth, for a total of $200, paid by Hersh. Hersh testified that he owned and controlled the corporation which was holding the launderette business being developed at 4300 Grove Street for him; the car he drove, although in Barth's name, belonged to him.

Hersh engaged the real estate broker and negotiated the lease in question. The broker testified that after he had prepared the lease, he called Hersh to sign it and Hersh informed him that he could not sign because of bankruptcy, but that his partner would sign it. Barth signed the lease but did not read it as he signed whatever Hersh asked him to sign. Hersh testified that after the lease was prepared, he read it but did not discuss or review its provisions with the officers of the corporation. After the dispute between the parties arose, Hersh did not discuss the matter with Barth. On January 4, 1960, the state suspended the corporation's right to do business.

There was also evidence that before March 1958, Hersh was interested in a launderette business located on Market Street in Oakland, carried under the firm name, Tub-O-Wash, under the name of Barth; Hersh testified that Barth was not his partner in that venture and had no interest in it. However, the uncontroverted evidence indicated that the business was in Barth's name, as were all the necessary licenses and permits, as well as state and federal tax forms. Hersh then stated that he paid the requisite fees and ran the business, but that Barth appeared as the record owner for credit purposes, as he (Hersh) had previously gone through bankruptcy. The Market Street business was sold in early 1958, and one David

Krinsky, as the escrow holder, had possession of the funds belonging to the seller. In this action, plaintiff levied a writ of attachment on these funds. Le Roy Hersh, as the attorney for Hersh, Barth and the corporation, wrote to plaintiff's attorney that these funds belonged to Barth.

It is now well established that the conditions for disregarding the corporate entity vary according to the circumstances of each case, and that the matter is particularly within the province of the trial court (*Shafford* v. *Otto Sales Co., Inc.*, 149 Cal.App.2d 428 [303 P.2d 428]; *Stark* v. *Coker*, 20 Cal.2d 839 [129 P.2d 390]). In view of the facts recited above, as well as the skimpy capitalization of the corporation, there can be no question that the court below reached the proper conclusion (*cf. Automotriz etc. De California* v. *Resnick*, 47 Cal.2d 792 [306 P.2d 1, 63 A.L.R.2d 1042]; *Shea* v. *Leonis*, 14 Cal.2d 666 [96 P.2d 332]).

Plaintiff argues that this court should make an additional award of attorney's fees and costs, for the prosecution of this appeal, pursuant to the relevant provision of the lease (Par. 19).[2] As indicated above, the court here awarded $900 for attorney's fees. We can see no reason under the facts of this case to make an additional award of attorney fees.

Judgment affirmed.

Shoemaker, J., and Agee, J., concurred.

A petition for a rehearing was denied February 14, 1962, and appellants' petition for a hearing by the Supreme Court was denied March 14, 1962.

---

[2] "19. *Counsel Fees:* If and as often as the Lessor should institute any suit against the Lessee for the violation of any of the covenants of this lease or for the recovery of the possession of the demised premises, or should intervene in any action or interests or rights hereunder, or should enter upon the demised premises pursuant to the terms hereof, the Lessee agrees to pay to the Lessor in each instance all costs thereof together with reasonable charges and expenses (including counsel fees incurred by or imposed upon by the Lessor as a result or in connection with any such litigation) unless otherwise agreed upon, the amount of such fee shall be fixed by the court."