[Civ. No. 471.   Fifth Dist.   May 21, 1965.]

COURTNEY C. PLATT, Plaintiff and Respondent, v. GLENN BILLINGSLEY et al., Defendants and Appellants.

W. Earl Shafer for Defendants and Appellants.

Wittman & Schmidt and William A. Wittman, Jr., for Plaintiff and Respondent.

STONE, J.—This is an appeal from a judgment holding appellants, as stockholders, personally liable for corporate indebtedness, and from an order denying their motion for new trial. Since the order denying new trial is nonappealable, appellants' attempted appeal therefrom must be dismissed. (*Rodriquez* v. *Barnett*, 52 Cal.2d 154, 156 [338 P.2d 907].)

In March 1960 appellants Billingsley and Grimm and two other persons purchased all of the stock of Nelson-McIntyre Corporation at $85 a share. Appellants each purchased 250 shares, the others 500 shares between them. The Nelson-McIntyre Corporation, organized in 1956, had operated a restaurant in Newport Beach, California. Net worth at the time of purchase was less than $27,000, there was a deficit of $51,972, and current liabilities exceeded current assets by more than $38,000.

The new stockholders contributed no capital to the corporation, although loans were made which appellant Billingsley was authorized to repay at any time in his sole discretion.

In January 1961 Billingsley and Grimm each sold one-half of his stock in the corporation to a Mr. Button for a total of $17,925. Although they had not received a "consent to trans-

fer stock'' from the California Commissioner of Corporations, Billingsley and Grimm accepted the $17,925 and deposited it in Billingsley's personal checking account. From time to time Bilingsley disbursed this stock-purchase money to Button personally and he, in turn, deposited the checks in his personal account. Button used the $17,925 to pay part of the remodeling costs, by drawing checks on his personal bank account. Billingsley also advanced $5,000 of his own money to Button, which was also used to pay construction costs. As part of the transaction, appellants, purporting to act on behalf of the corporation, employed Button to supervise and direct remodeling of the building to a Polynesian-style restaurant.

Respondent, a general contractor, entered into a written cost-plus contract with the corporation on or about March 9, 1961, to remodel the restaurant. Button and his wife were social friends of respondent and his wife, and the court found that respondent relied upon Button's assurances that adequate funds were available to pay the costs of the remodeling, and that wealthy individuals named by Button were backing the project. Respondent completed the job on or about April 7, 1961, at a cost of $42,000.

Early in the course of construction respondent was paid regularly as the work progressed, but toward the end checks were returned ''Nonsufficient Funds,'' and a balance of approximately $12,529 remained unpaid. Respondent elected not to file a lien at the conclusion of the work, nor to file suit immediately, as Button and appellant Billingsley assured him that he would be paid in monthly installments with interest at 10 per cent. No payments were made on account, so in September 1961 respondent commenced an action against the corporation and attached $7,999. Subsequently $4,000 was released upon the promises of Button and Billingsley that the corporation would give respondent a chattel mortgage on the restaurant equipment. By the time the chattel mortgage was given respondent in December 1961, it was valueless because of tax liens against the corporation.

Respondent then initiated this action, and the trial court found against Button, Billingsley and Grimm personally, on the theory of *alter ego*. Only Billingsley and Grimm appealed.

Appellants first assert that the issue of *alter ego* was not raised by the pleadings. ██ The necessary allegations to plead the theory of *alter ego* are summarized in 2 Witkin, California Procedure, page 1326, as follows: ''A creditor may seek to *disregard the corporate entity,* and hold individuals

liable on obligations of a corporation, where the corporate form is used to accomplish a fraudulent object. This is not an action based on fraud, for the cause of action and remedy sought may have nothing to do with fraud. The complaint merely sets forth additional facts of improper domination of the corporation as a basis for judgment against the individ·ials.''

Respondent's complaint in the trial court alleges that: ''. . . although defendants used the corporate name, the corporation was grossly undercapitalized, heavily indebted to various creditors, was lacking assets and working capital with which to do business, and was not operating in compliance with the California Corporations Code, the Corporate Articles of Incorporation and the Corporate Bylaws; and, in fact, the defendants were the alter ego of the corporation and were conducting a restaurant business, known as FRED BUTTON's TRADER ISLAND, in the City of Newport Beach, State of California, as their individual enterprise and as a joint venture among themselves.''

By their answers, appellants denied these allegations; and the pertinent part of the pretrial conference order signed by counsel for all parties, reads: ''This is an action by the plaintiff, a contractor, to recover the balance allegedly due for remodeling and construction work on a restaurant. The restaurant was owned and operated by a corporation in which the individual defendants were stockholders. In this action against the individual defendants, plaintiff is seeking to disregard the corporate entity. Each of the defendants denies any personal liability and assert [sic] that the plaintiff's only recourse, if any, is against the corporation.''

The foregoing excerpts from the pleadings and pretrial proceedings reflect clearly that the question of *alter ego* was placed in issue at the commencement of the trial. Moreover, the issue of *alter ego* was thoroughly litigated in the trial.

Appellants' argument that the pleadings are defective rests largely upon the reversal of a judgment piercing the corporate veil, in *Judelson* v. *American Metal Bearing Co.*, 89 Cal. App.2d 256 [200 P.2d 836]. The instant case is not apposite to *Judelson,* however, as in that case the theory of *alter ego* was not pleaded at all.

Appellants next argue that since the complaint alleges they were operating the restaurant business ''as their individual enterprise and as a joint venture among themselves,'' there

can be no judgment against them upon the theory of *alter ego* unless the evidence reflects a joint venture. There was no finding of joint venture, but this does not invalidate the judgment.

To hold appellants liable, respondent had the burden of proving that the corporation was dominated and controlled by appellants, and that there existed a unity of interest and ownership in appellants as individuals. But it was not necessary to prove, additionally, that the stockholders were operating under a joint venture agreement in order to pierce the corporate veil.

This brings us to the kernel of the case, whether there is substantial evidence to support the finding of the trial court that the *alter ego* doctrine is applicable. A long line of cases has established two criteria for making this determination, (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individuals no longer exist, and (2) if the acts are treated as those of the corporation alone an inequitable result will follow. (*Automotriz etc. De California* v. *Resnick,* 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042]; *Stark* v. *Coker,* 20 Cal.2d 839, 846 [129 P.2d 390]; Ballantine & Sterling, California Corporation Laws, § 43A, p. 90C.)

As might be expected, evidence concerning these criteria is as diverse as business ventures themselves. A digest of factual situations discussed in cases that have applied the doctrine of *alter ego* was made in *Associated Venders, Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825 [26 Cal.Rptr. 806]. From pages 838-840 we quote that portion of the analysis referring to factual situations which we deem applicable in the instant case: ". . . the treatment by an individual of the assets of the corporation as his own [citations]; the failure to obtain authority to issue stock or to subscribe to or issue the same [citations]; the holding out by an individual that he is personally liable for the debts of the corporation [citations]; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . . the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; . . . the failure to adequately capitalize a corporation; the total absence of corporate assets and undercapitalization [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or

another corporation [citations]; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities [citations]; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . .; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, . . .''

In the light of the foregoing authorities we shall discuss the facts from which the trial court concluded that appellants were using the corporation as a facade to protect themselves against personal liability in a speculative venture. One of the most significant facts supporting this inference is that the corporation was undercapitalized at all times pertinent to this action.

When appellants and two associates bought all of the stock of the corporation, the purchase money went to the sellers of the stock, not into the corporation treasury. At that time the total corporate liabilities exceeded total assets by some $38,000. Thus the record indicates that appellants purchased the stock of an insolvent corporation within the literal sense of Civil Code section 3450: ''A debtor is insolvent, within the meaning of this title, when he is unable to pay his debts from his own means, as they become due.''

Moreover, no capital contribution was made to the corporation, and creditors' claims and tax liens put an end to the business in December 1961. Appellant Billingsley, who was ''appointed'' a director and who managed the restaurant until Button came along, made loans to the corporation, repayable to him at any time in his discretion. These loans actually added to the corporation's obligations without improving its financial condition, and by October 31, 1960, liabilities exceeded assets by $48,600. By April 30, 1961, when respondent's claim for remodeling came due, liabilities exceeded assets by approximately $165,000.

Appellants argue that they contributed $23,000 to the corporation at the time respondent commenced remodeling. It is true they made this money available to apply on the cost of remodeling, but they did not advance the money to the corporation; it was deposited in appellant Billingsley's personal account. He, in turn, made the money available to Button, who succeeded Billingsley as manager, and Button placed the money in his personal account. Button, by personal

check, used these funds to pay respondent for part of the work and materials furnished the corporation.

This particular transaction has a bearing on four aspects of the *alter ego* doctrine. First, Billingsley and Button retained personal control over the funds which were never deposited in the corporation account and never became subject to claims of corporation creditors. Second, $17,925 of the money came from the sale of part of appellants' corporate stock. They did not risk their own capital; rather, they sold Button stock in an undercapitalized venture and risked Button's money in an attempt to bolster a faltering business.

Third, use of the money to pay debts of the corporation violated representations appellants made to the Corporation Commissioner in seeking permission to sell half of their stock to Button. Appellants represented to the commissioner that: "None of the proceeds from the sale of said shares will be used directly or indirectly for the benefit of said corporation, but are for the personal, individual benefit of the undersigned."

As part of the same application, Button joined with Billingsley and Grimm in the following additional statement: ". . . that none of the proceeds to be received by said transferors for the transfer of said securities to the undersigned may legally be used, directly or indirectly for the benefit of Nelson-McIntyre Corporation, but are for the benefit of the transferors only."

Violation of these representations to the commissioner not only evidences an intent to circumvent the corporation law but, of particular significance, it reveals appellants' disregard for the corporate entity.

Fourth, this use of funds manifests a unity of action among appellants Billingsley and Grimm and their codefendant, Button, who has not appealed. Grimm's principal disclaimer of liability rests on the assertion that he did not actively participate in the remodeling of the restaurant and that he was not present when most of the representations were made to respondent. But the sale of half of his stock and the funneling of the proceeds from the sale through personal bank accounts kept separate from corporation accounts, links Grimm and Billingsley to the venture and to Button, the manager.

The record also reflects that at a meeting of respondent with Button, Billingsley and Grimm, both Billingsley and Grimm offered to pledge their remaining stock, which was their per-

sonal property, to secure the corporate obligation. ■ The finding that Grimm acted with Billingsley and Button is further strengthened by the deposition of appellant Billingsley, in which he testified:

"Is the corporation functioning now, operating? A. No.

"Q. Does it have any assets that you know of? A. I don't know. When I resigned, I never went—when my attorney or my partner, Mr. Grimm, resigned, I resigned 30 days after."

Grimm contends this testimony is inadmissible as against him because the joint relationship between him and Billingsley was not proved aside from this statement of Billingsley. Grimm cites Code of Civil Procedure section 1870, subdivision 5, which provides: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts:

"  .  .  .  .  .  .  .  .  .  .  .  .

"5. After proof of a partnership or agency, the act or declaration of a partner or agent of the party, within the scope of the partnership or agency, and during its existence. The same rule applies to the act or declaration of a joint owner, joint debtor, or other person jointly interested with the party; . . ."

Though we think the stock transaction whereby Grimm and Billingsley sold half of their stock to Button and used the money received from Button for the remodeling, constituted sufficient proof of joint interest and joint action by Grimm and Billingsley to meet the requirements of Code of Civil Procedure section 1870, subdivision 5, the testimony is admissible in any event to prove the relationship. In discussing a similar question, the court held, in *Hupfeld* v. *Wadley,* 89 Cal.App.2d 171, at page 176 [200 P.2d 564]: "The final assignment is that the court erred in admitting certain testimony of Wadley before the existence of the joint enterprise was established as required by Code of Civil Procedure, section 1870, subdivision 5. Such testimony was admitted for the obvious purpose of establishing the existence of the relationship of the defendants upon which the joint liability could be predicated. Subdivision 5, *supra,* should not be so construed as to preclude the admission of evidence tending to establish the very existence of a relationship which, if established permits the use of the testimony of one interested party against another."

586

■ As to appellants' contention that neither of them is bound by the statements and actions of Button, the evidence discloses that appellants appointed Button manager of the restaurant business, that they placed him in immediate charge of remodeling the building, and that he was actually on the job. Billingsley, by personal check, furnished Button the money to pay respondent in part for his work but, as noted above, the money came from Button in the first place, was paid to Billingsley and Grimm to purchase half of their stock, and went back into the restaurant building through Button. The inference from this evidence that Button was acting with and for appellants in remodeling the restaurant is not unreasonable. Agency may be proved by circumstantial evidence of this character. (*Anglo-California Bank* v. *Cerf,* 147 Cal. 393 [81 P. 1081] ; *People* v. *Frangadakis,* 184 Cal.App.2d 540, 549 [7 Cal.Rptr. 776].) The importance of this agency or unity of action is that Button misrepresented to respondent the corporate assets and the people financially backing the corporation.

Other acts of appellants that support the trial court's decision to pierce the corporate veil include (a) Billingsley's promise to protect respondent by a chattel mortgage on kitchen equipment, a representation upon which respondent relied in releasing $4,000 of a $7,999 attachment of corporate assets; (b) an offer by Billingsley and Grimm to pledge their corporate stock, their personal property, to secure the corporate obligation; (c) operation of the corporation with only two directors, a violation of the by-laws of the corporation and of California Corporations Code section 800, requiring that: ". . . all corporate powers shall be exercised by or under authority of, and the business and affairs of every corporation shall be controlled by, a board of not less than three directors."

The foregoing evidence has been summarized most favorably to respondent and all intendments and reasonable inferences have been indulged to sustain the findings, as we are admonished to do on appeal (*Berniker* v. *Berniker,* 30 Cal.2d 439, 444 [182 P.2d 557] ). ■ We have in mind, also, that the doctrine of *alter ego* does not depend upon the presence of actual fraud but is fashioned to prevent that which would result in fraud or an injustice, and that the doctrine is essentially one of equity which rests largely upon the facts peculiar to each case. (*H.A.S. Loan Service, Inc.* v. *McColgan,* 21 Cal.2d 518, 523 [133 P.2d 391, 145 A.L.R. 349] ; *Kazutoff* v. *Wahlstrom,* 196 Cal.App.2d 65, 69 [16 Cal.Rptr. 207].)

■ Viewing the evidence in the light of the foregoing applicable rules, there is substantial evidence to support the findings of the trial court that:

"At all relevant times, the corporation was influenced, dominated and controlled by defendants, Billingsley, Grimm and Button, and there existed such a unity of interest and ownership that the individuality and separateness of these defendants and the corporation ceased.

"That if the acts of the defendants, Billingsley, Grimm and Button are considered those of the corporation alone, an inequitable and unjust result will follow."

The purported appeal from the order denying new trial is dismissed, as the order is nonappealable. The judgment is affirmed.

Conley, P. J., concurred.

A petition for a rehearing was denied June 16, 1965, and appellants' petition for a hearing by the Supreme Court was denied July 14, 1965.