[Civ. No. 37050. Second Dist., Div. Five. May 18, 1971.]

BERT PEARL, Plaintiff and Appellant, v.
PHILIP SHORE, Defendant and Respondent.

## Counsel

Bazar & Epstein and James P. Herzog for Plaintiff and Appellant.

Bernard Reich for Defendant and Respondent.

## Opinion

**KAUS, P. J.**—This is an appeal from a judgment in favor of the defendant-respondent, entered pursuant to the granting of a "motion to strike and dismiss" the plaintiffs' first amended complaint. Out of nine plaintiffs, only Mr. Pearl has chosen to appeal the trial court's determination, which, we also add, relates only to the single defendant, Mr. Shore, and not to the various other defendants named in the instant action.

On December 20, 1963, the plaintiff became involved in a limited partnership investment whereby nine limited partners invested a total of $60,000, $30,000 of which was contributed by Mr. Pearl. The general partner, it was agreed, was to be S.K.R. Enterprises, Incorporated ("S.K.R."), whose principal and equal shareholders were the defendants in the instant action, Philip Shore, Irving C. Rubin, Morton L. Rubin and Elliot Kalt. These four were also treasurer, president, second vice president and secretary, respectively, and, except for Morton L. Rubin, directors of the corporation. The limited partnership was called "S.K.R.—Lindley."

In Pearl's initial complaint the defendant Shore was not named. The original summons was lost and an "alias summons" was issued for an amended complaint, which then named Shore as a defendant. Contending that service of such summons did not confer jurisdiction over the new

defendant, Shore petitioned this court for a writ of mandate or prohibition to halt or restrain further action by the plaintiffs. The writ was denied. The Supreme Court denied a hearing.

Shore then demurred to and moved to strike and dismiss the first amended complaint. The trial court granted the motion to strike after depositions and sworn declarations were filed. It did not rule on the demurrer.

In all, the amended complaint attempts to state seven causes of action. The first alleges that the corporate purpose of S.K.R. was in reality based upon a "fraudulent plan, scheme and device" to divert funds to the defendants' personal use. There are also allegations of a lack of separateness between the corporation and the individuals, and of the corporation's insolvency, so that no action can be successfully brought against it. This cause of action seems to revolve around the last two paragraphs where the plaintiffs allege that defendants are indebted to them in the sum of $60,000 "for money paid and delivered by Plaintiffs to Defendants at the special instance and request of Defendants. . . ." Finally, because of the defendants' "oppression, fraud, and malice" the plaintiffs request exemplary damages in the sum of $180,000.

The second cause of action is no less confusing. Without alleging that they are minority shareholders in S.K.R., plaintiffs state that all of the defendants, comprising 100 percent of the shareholders, conspired to take secret profits and improperly withhold dividends, and refused to disseminate information regarding the corporate affairs, all to the detriment of the minority shareholders. The remainder of this cause of action dwells upon the defendants' knowingly false representations that they would operate the affairs of the limited partnership for the benefit of the partnership, their fraudulent appropriation of partnership funds, and the plaintiffs' reliance upon those false representations. Simply stated, the second cause of action might be labeled "conspiracy to deceive and defraud."

The third cause of action is merely a verbatim repetition of the substance of the second, except that no conspiracy allegation is set forth.

The fourth cause of action realleges the third, but adds that the defendants had no ground to believe their representations to be true, "in that Defendants did not have sufficient information and data to make such representations," nor did defendants apprise the plaintiffs of their lack of information.

To this somewhat heady brew is added the ingredient of a violation of section "2500 et seq.,"[1] of the Corporations Code, in the fifth cause of

---

[1] It is apparent that the plaintiffs meant to cite to section 25000 et seq. of the Corporations Code.

action. The plaintiffs state that by defendants' "failure to obtain a permit to issue securities all transactions by and between Plaintiffs and Defendants are null and void."[2]

As a sixth cause of action, the plaintiffs allege that because of the defendants' fraud and deceit the plaintiffs are entitled to rescind the partnership agreement, and that the individual defendants are liable to the plaintiffs by virtue of a sale of the partnership property on December 21, 1965.

Finally, the last cause of action realleges the first and sets forth conduct forming the basis for the dissolution of "S.K.R.—Lindley," pursuant to section 15032 of the Corporations Code. It also requests an accounting.[3]

Before moving to the validity of the trial court's determination, we must first dispose of a procedural problem. Without deciding whether a motion to strike and dismiss a "sham" complaint grants the trial court wider powers than it has under section 437c of the Code of Civil Procedure, we consider the trial court's granting of the motion to strike and dismiss, as if it were a summary judgment proceeding. (*Lavine* v. *Jessup,* 48 Cal.2d 611, 614, fn. 2 [311 P.2d 8]; *Pianka* v. *California,* 46 Cal.2d 208, 212 [293 P.2d 458]; *Hosking* v. *Spartan Properties, Inc.,* 275 Cal.App.2d 152, 154-156 [79 Cal.Rptr. 893]; *Lerner* v. *Ehrlich,* 222 Cal.App.2d 168, 171-172 [35 Cal.Rptr. 106]; Chadbourn, Grossman & Van Alstyne, California Pleading, § 1463.) Plaintiff cannot complain of this.

■ It is now well established that a motion for a summary judgment is not a challenge to the other party to show that there are triable issues of fact, but that the moving party's own showing must first negate the existence of such triable issues, even if the ultimate burden of proof is on the other side. (*Fuller* v. *Goodyear Tire & Rubber Co.,* 7 Cal.App.3d 690, 693 [86 Cal.Rptr. 705]; *Barnes* v. *Blue Haven Pools,* 1 Cal.App.3d 123, 127, [81 Cal.Rptr. 444].) We review the present record in the light of that rule.

■ Shore's showing consists, in the main, of his deposition. It depicts him as a man who, because of his own lack of business acumen and the unjustified sanguinity of his three codefendants, lost somewhere around $200,000 as a result of his connection with S.K.R. S.K.R. was formed by

---

[2]Note that the Corporations Code applicable at the time of the various transactions, in section 25100, exempts the sale of partnership interests from the requirement of obtaining a permit for sale. Subdivision (1) exempts "[a]ny partnership interest in a general partnership, or in a limited partnership where certificates are executed, filed, and recorded as provided by Sections 15502 and 15525 of the Corporations Code of the State of California. . . ." The pleaded agreement provides for compliance with the Corporations Code. No lack of compliance is alleged.

[3]By its own terms the partnership has ceased to exist since December 20, 1968, so that the request for a dissolution presents a moot point. However, this does not preclude the need for an accounting.

Shore, Elliot Kalt, Irving C. Rubin and Morton L. Rubin for the purpose of purchasing several parcels of land and constructing apartment houses thereon. Each project was to be operated as a limited partnership with capital contributions thereto made by the limited partners, such as the plaintiff Pearl. S.K.R. was to be the general partner.

Each of the four shareholders purchased $25,000 worth of stock, Shore lending the other three about half of the money they needed. In return he was given notes and a pledge of the stock, but did not have the right to vote more than his 25 percent. He had nothing to do with the day to day operation of the corporation. The other shareholders only involved Shore in the corporate business when they needed additional funds for down payments on new properties. He advanced such funds.

As far as the limited partnership venture in which the plaintiff Pearl invested is concerned, Shore had merely heard of the name, was not "involved in any deal pertaining" thereto, had never seen the limited partnership agreement, had never seen or met any of the limited partners and had never even talked to the other three shareholders about them. In fact on none of the projects did he have anything to do with any of the limited partners.

According to Shore the basic reason for S.K.R.'s financial demise was that the other three shareholders who were running the corporation acquired additional properties too soon, drew salaries and incurred expenses not justified by the corporation's profit—if any. Shore drew no salary. At least one property was turned back to Shore who had been forced to make good on his guarantee of a loan for the purchase price, when the corporation ceased to pay interest.

We leave our discussion of the law for a later point and merely state here that in our opinion Shore's showing adequately negatives any cause of action which the investors in "S.K.R.—Lindley" might have directly against Shore, on any of the pleaded causes of action, or indirectly by way of an *alter ego* theory. He personally had nothing whatever to do with them. He had never even talked to his co-shareholders about them. He was a legal stranger to them.

Plaintiff's own deposition establishes that Shore was also a personal stranger to him. Pearl was apparently solicited to join the limited partnership by Irving Rubin. Irving Rubin's dealings were largely with plaintiff's attorney, a Mr. Lurie. Plaintiff himself knew of no facts which would have supported any of the charging allegations in the complaint.

Lurie failed to appear for a deposition. Plaintiff did, however, file his declaration. It contains nothing but inadmissible hearsay and conclusions

so obviously unsupported by facts that they amount to nothing, even when filed in opposition to a summary judgment.[4]

A picture somewhat different from that painted by Shore emerges from the depositions of Kalt and the Rubins. Unfortunately it is extremely vague, for the books and records of the corporation either would or could not be located and the witnesses spoke about the various real estate ventures in generalities without the benefit of documentation.

They complained that Shore demanded 10 percent interest on money he had loaned to the corporation, initially took title to one property in his own name but for the benefit of the corporation and eventually used his status as a creditor to force the corporation to deed properties to him in satisfaction of S.K.R.'s debts. It was not claimed, however, that the debts were not due, nor does it appear that in the corporation's dealings with him, Shore gained any undue financial advantage.[5] The most that can be

---

[4]"I know of my own knowledge *and have been informed by defendants,* IRVING RUBIN, MORTON RUBIN, and ELLIOT KALT *that* there was a commingling of funds as well as business affairs between defendant SHORE and S.K.R. ENTERPRISES, INC.; that the equity capital available to S.K.R. ENTERPRISES was insufficient because of the following acts of the principals:
"1. Withdrawing substantial salaries against capital and not earned profits;
"2. Withdrawing of interest payments against capital and not profits;
"3. Withdrawing funds from the corporation equivalent to a dividend without a corporate surplus being available for that purpose;
"4. Depleting the corporate assets by handling the corporate funds as defendant SHORE's personal funds so that the corporation was unable to fulfill its obligations under the S.K.R.—LINDLEY Limited Partnership Agreement; all of the acts hereinbefore alleged occurred during the period and during the times mentioned in the first amended complaint herein and during the times in which plaintiffs relied upon and dealt with defendants. . . .
"As attorney representing BERT PEARL, who became a limited partner in S.K.R.—LINDLEY, in determining the amount of BERT PEARL's investment, I know of my own knowledge there was definite reliance by plaintiff PEARL and by me as his attorney on the financial resources of PHILIP SHORE alone.
"5. In conclusion, it appears that the four individuals may have in form only (documented shareholders and directors meetings) attempted to conduct their affairs as a corporation, but that in substance it was conducted as the sole proprietorship of PHILIP SHORE."

[5]It also appears that for a time, at least, the corporation was paying interest, taxes and other current expenses on the properties when Shore already had title to them. It does not appear when and why such payments ceased. The picture that emerges rather dimly from all this talk about facts which, with reasonable diligence, should have been documented, is that for a time after the properties were deeded to him Shore considered himself as trustee for the corporation, having given—or retaining—legal title to secure his interest and that when the corporation ceased servicing the properties, probably because it ran out of money, he simply retained title. Nothing in the record suggests that the corporation would have been better off had more orthodox methods of foreclosure been utilized, nor is there any evidence to contradict Shore's estimate that his own losses amounted to about $200,000. Nothing in the record indicates how, if at all, the corporate affairs were ever wound up.

said is that he ceased being the corporation's "angel" rather sooner than the other shareholders had hoped. They also complained that Shore at one point promised that if buyers for the properties were found, he would sell them and credit the corporate account with the profits, if any. He then refused to deal with prospective purchasers. There is no suggestion, however, that they ever produced a purchaser willing to pay a price which would have resulted in a profit. At no point in the record did plaintiff attempt to show just how and why the corporation became frustrated in its basic purpose, namely to convert raw land which costs money to own into apartment buildings which create a profit.

## DISCUSSION

Liability on the seven causes of action is apparently predicated upon three bases: (1) that the corporate entity should be disregarded so that Philip Shore would be held accountable for S.K.R.'s debts; (2) that Shore is personally liable for conspiracy to defraud, fraud, and misrepresentation, all perpetrated upon Bert Pearl; and (3) that Shore is personally liable to Pearl for not adhering to the strictures·of section 25000 et seq. of the Corporations Code as well as for an accounting of the partnership account.

■■ We hold that the trial court properly disallowed the plaintiffs' attempt at attaching personal liability for corporate debts upon the defendant. ■ "Summary judgment is proper only if the affidavits or declarations . . . in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show facts sufficient to present a triable issue of fact." (*Parker* v. *Twentieth Century-Fox Film Corp.,* 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689].)

■■ In the leading case of *Associated Vendors, Inc.* v. *Oakland Meat Co.,* 210 Cal.App.2d 825, 838 [26 Cal.Rptr. 806], it is said that ". . . bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity. . . ." It seems to us that plaintiff's attempt to fasten corporate liabilities onto defendant must fail because of the complete lack of showing of bad faith, in any form.

Plaintiff claims that the corporation was undercapitalized for the ventures it pursued. Whether or not undercapitalization alone can be the basis for disregarding the corporate entity is a nice point. (See *Harris* v. *Curtis,* 8 Cal.App.3d 837, 841-843 [87 Cal.Rptr. 614].) We have looked at many cases which involve undercapitalization as a factor in determining whether

or not the corporate veil should be pierced.[6] In none of them was the capitalization anything near the $100,000 involved here. Of course if a corporation keeps on purchasing raw land and does virtually nothing with it, yet goes on paying interest on loans, taxes and salaries to its officers and other employees, any amount of capital would soon disappear. The troubles of S.K.R. seem to be attributable to poor management on the part of Kalt and the Rubins, rather than initial undercapitalization.

Plaintiff makes much of the several properties which defendant eventually acquired and on which the corporation had spent money for taxes, interest and other upkeep. However, as noted, there is nothing in the record to suggest that had the creditor been a bank, and had the securities been conventional trust deeds, rather than trust deeds disguised as deeds, the corporation would have been one whit better off. There was much talk in the court below of defendant "dealing with corporate assets as his own," "commingling" and so forth. The use of such catch phrases from the glossary of *alter ego*[7] law ignores the fact that legally and equitably defendant had a substantial security interest in the properties.[8]

---

[6]*Minton* v. *Cavaney*, 56 Cal.2d 576 [15 Cal.Rptr. 641, 364 P.2d 473] (none); *Automotriz etc. De California* v. *Resnick*, 47 Cal.2d 792 [306 P.2d 1, 63 A.L.R.2d 1042] (none); *Harris* v. *Curtis*, 8 Cal.App.3d 837 [87 Cal.Rptr. 614] ($1,000); *Linco Services, Inc.* v. *DuPont*, 239 Cal.App.2d 841 [49 Cal.Rptr. 196] (none); *Platt* v. *Billingsley*, 234 Cal.App.2d 577 [44 Cal.Rptr. 476] (none); *Rosen* v. *E. C. Losch Co.*, 234 Cal.App.2d 324 [44 Cal.Rptr. 377] ($856); *Auer* v. *Frank*, 227 Cal. App.2d 396 [38 Cal.Rptr. 684, 8 A.L.R.3d 1108] (none); *Remme* v. *Herzog*, 222 Cal.App.2d 863 [35 Cal.Rptr. 586] ($7,700); *Bellerue* v. *Business Files Institute, Inc.*, 215 Cal.App.2d 383 [30 Cal.Rptr. 232] ($1,000); *T W M Homes, Inc.* v. *Atherwood Realty & Inv. Co.*, 214 Cal.App.2d 826 [29 Cal.Rptr. 887] ($2,000); *McKee* v. *Peterson*, 214 Cal.App.2d 515 [29 Cal.Rptr. 742] ($12,500); *Associated Vendors, Inc.* v. *Oakland Meat Co.*, 210 Cal.App.2d 825 [26 Cal.Rptr. 806] ($8,000); *Goldsmith* v. *Tub-O-Wash*, 199 Cal.App.2d 132 [18 Cal.Rptr. 446] ($200); *Wheeler* v. *Superior Mortgage Co.*, 196 Cal.App.2d 822 [17 Cal.Rptr. 291] ($30); *Kazutoff* v. *Wahlstrom*, 196 Cal.App.2d 65 [16 Cal.Rptr. 207] (?); *Paul* v. *Palm Springs Homes, Inc.*, 192 Cal.App.2d 858 [13 Cal.Rptr. 860] (2 corps.: none; $500); *Claremont Press Pub. Co.* v. *Barksdale*, 187 Cal.App.2d 813 [10 Cal.Rptr. 214] ($500); *Talbot* v. *Fresno-Pacific Corp.*, 181 Cal.App.2d 425 [5 Cal.Rptr. 361] (none); *Temple* v. *Bodega Bay Fisheries, Inc.*, 180 Cal.App.2d 279 [4 Cal.Rptr. 300] ($10,000); *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc.*, 166 Cal.App.2d 652 [333 P.2d 802] (2 corps.: $200; $500); *Petersen* v. *Cloverdale Egg Farms*, 161 Cal.App.2d 792 [327 P.2d 127] (one vehicle); *Bariffi* v. *Longridge Development Co.*, 156 Cal.App.2d 583 [320 P.2d 192] ($200); *Engineering etc. Corp.* v. *Longridge Inv. Co.*, 153 Cal.App.2d 404 [314 P.2d 563] ($200); *Shafford* v. *Otto Sales Co., Inc.*, 149 Cal.App.2d 428 [308 P.2d 428] ($50); *Hiehle* v. *Torrance Millworks, Inc.*, 126 Cal.App.2d 624 [272 P.2d 780] ($2,000); *Taylor* v. *Newton*, 117 Cal.App.2d 752 [257 P.2d 68] ($100); *Carlesimo* v. *Schwebel*, 87 Cal.App.2d 482 [197 P.2d 167] ($1,221.82); *Norins Realty Co.* v. *Consol. A. & T. G. Co.*, 80 Cal.App.2d 879 [182 P.2d 593] (?); *Geisenhoff* v. *Mabrey*, 58 Cal.App.2d 481 [137 P.2d 36] (none); *Marr* v. *Postal Union Life Ins. Co.*, 40 Cal.App.2d 673 [105 P.2d 649] (?).

[7]The trial court's order recites: "Plaintiff . . . is not entitled to keep defendant Shore involved in a lawsuit by cliche only."

[8]We feel apologetic about the vagueness with which we must, from time to time,

■ "It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances in each case. (See *H. A. S. Loan Service, Inc.* v. *McColgan*, 21 Cal.2d 518, 523 [133 P.2d 391, 145 A.L.R. 349]; *Stark* v. *Coker*, 20 Cal.2d 839, 846 [129 P.2d 390].) It has been stated that the two requirements for application of this doctrine are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. . . ." (*Automotriz etc. De California* v. *Resnick, supra,* 47 Cal.2d 792, 796.) ■ We are not persuaded that plaintiff has shown that there is a triable issue with respect to whether a failure to pierce the corporate veil will or will not result in an inequity. To the contrary, it seems plain that all the equities are on defendant's side.

So much for any personal liability of Shore based on a piercing of the corporate veil as to him.[9] We now turn to the various fraud counts in the

---

talk about the facts in this case, yet it is plaintiff, rather than we, who ought to feel guilty. The complaint in the instant action which did not name defendant Shore was filed February 3, 1966. A first amended complaint was filed July 11, 1967. For reasons not apparent from the record Shore did not appear in the action until April 8, 1969. The summary judgment was granted on August 19, 1969. Plaintiff thus had over 3½ years in which to gather or at least locate documentary evidence which would have helped determine many of the factual problems with precision. The trial court stated in its minute order granting defendant's motion: ". . . The court notes it is now over 3½ years since this action was commenced against defendant Corporation with a joinder of defendant Rubin as co-defendant as an alleged alter-ego of that Corporation. Although continuance after continuance has been granted to plaintiffs on this Motion in order to afford them another opportunity to come up with some *evidence* of any alter-ego allegation or element, the best showing to date after all these years is hearsay upon hearsay compounded. It is significant to this court that although hearsay assertions are made as to evidence allegedly available on the subject in question, to date not even one of plaintiff's attorneys has come forward with evidence under oath by deposition, interrogatory or declaration, nor has such evidence been elicited from co-defendants hostile to the moving defendant, despite the continuances of this Motion, and, more importantly, during the long history of this litigation nothing evidentiary is even offered against the original defendant Rubin in this connection or, as now alleged, his confederate defendant Shore."

[9]The trial court's minute order says much the same as what we have been saying. It is worth quoting.

"This court is persuaded of the absence of such evidence after reading the deposition of the moving defendant from which it would appear that he was mulcted and imposed upon to the extent of many thousands of dollars; a complete absence for any assertion of undercapitalization of the corporation for its internal operational expense as distinguished from the projects it was organized to embark upon for which capital would be financed through independent loans, loans from the moving defendant, or

plaintiff's attempt to attach direct liability on Shore. ■ The defendant's fraud liability may be predicated upon either a direct misrepresentation as to the defendant's willingness to back the corporation, a misrepresentation by way of his agents or co-venturers, the Rubins and Kalt, or the fraudulent appropriation of corporate assets to the plaintiff's detriment. In all instances, we must affirm the judgment. It is undisputed that no contact between Pearl and Shore took place, since Shore never dealt directly with any limited partners, including those who were involved in the Lindley deal. Nor does the plaintiff allege an agency or joint venture relationship between Shore and the other corporate officers, even though Shore specifically denies such possibilities. Finally, no fraudulent misappropriation theory can be sustained because the plaintiff offers no facts upon which such a claim can be based, and the defendant's claim that he received no assets or funds, outside of the transactions involving the various loans, is surprisingly undisputed and even supported by the plaintiff's

---

from limited partnerships' investments of the plaintiffs herein indicated by the particular investments of the plaintiffs herein for a limited project. Further, there is nothing in the present record that even remotely suggests that the corporation was undercapitalized at the inception, or otherwise, to perform its contemplated functions as a general partner in limited partnerships on its own account as a builder. We draw a distinction for this purpose of alter-ego, between hindsight and foresight and also between required operational expense to operate as a corporation consistent with its purposes and the funds needed to embark on building enterprises. In the latter area, every corporation is financed by outside loans and/or 'investment' money of 'partners.'

"Such 'control' as it is alluded to in oral argument or otherwise indicated in his deposition would no more than secure the advances made then by him for such additional projects as distinguished from his investment for the capitalization of the corporation's operation, and is not to be deemed any more reprehensible than if an independent bank made those same loans with the same kind of securities to protect itself. By having a stockholder's interest in addition to a lender's interest he is not then to be subjected to an alter-ego concept per se. On the other hand, if we wholly disregard his deposition as being self-assertive, or for any other reason such as lacking in credibility that a man with his business experience would submit to the exactions to which he was submitted, the record still remains barren of any proof of alter-ego. It is not salvaged by anything alluded to in the depositions taken at this late stage of Rubin and/or Kalt, and their hostile conclusionary assertions by one defendant against another, unsupported by evidentiary statements, is insufficient in the opinion of this court to foist an alter-ego relationship on the moving defendant. As we understand the concept of alter-ego, it is to be applied in order to avoid inequitable results in a proper case; were we to apply it here on this state of the record or to attempt to apply it, only inequity would be the result, when we consider that no one has pointed to an operational control by this defendant of the corporation's activities, as contrasted to the record reflected by the issuance of stock on the basis of 25% only to him and his minimal participation otherwise indicated, negating the concept of control in the sense that it is used in alter-ego cases."

evidence. No triable issue of fact has been brought out, although the defendant's showing is sufficient to sustain a judgment in his favor.

Finally, the provisions of section 25100, subdivision (1) of the Corporations Code preclude the fifth cause of action (see fn. 2, *ante*).

Since only the corporation, not Shore, may be liable for an accounting to Pearl, we need not be concerned with the last cause of action.

The judgment is affirmed.

Stephens, J., and Aiso, J., concurred.