**In the Matter of CHRISTIAN AND PORTER ALUMINUM COMPANY, Bankrupt.**

**Kerry H. GOUGH, Trustee, Petitioner-Appellee,**

v.

**DeWayne F. TITUS et al., Respondents-Appellants.**

**No. 75–2587.**

United States Court of Appeals, Ninth Circuit.

Oct. 17, 1978.

---

2. Wright & Miller, *Federal Practice and Procedure*: Civil §§ 2524, 2536.

Gordon W. Nelson, Fremont, Cal., William L. Mahaffey, Jr., Walnut Creek, Cal., for respondents-appellants.

Robert R. Barton, Oakland, Cal., for petitioner-appellee.

Before TRASK and TANG, Circuit Judges and TAKASUGI,* District Judge.

TAKASUGI, District Judge.

Appellants [1] are seeking review of an order of the district court affirming the bank-

* Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation.

1. Appellants: DeWayne F. Titus; Transocean Export Packing, Inc.; Barbary Coast Properties, Inc.; Dee-Jay Holding, Inc.; Modular Construction and Development; National Building Components, Inc.; Modulemode Corporation; Continental Consolidated, Inc.; Transocean Enterprises, Inc.; Payrolls, Inc.; Aluminum Extruded Shapes, Inc.; All American Machinery Co., Inc.; California Western Trucking; Coast Corrugated Container Corporation; Harbor

ruptcy judge's ruling in favor of the trustee and against appellants for $462,039.39. The appeal presents the following issues:

(1) Can a corporate litigant defend or appeal a federal action if it has been suspended for non-payment of its California Franchise Taxes?

(2) Was there jurisdiction in the bankruptcy court to determine the adverse claims of appellants by summary proceedings?

(3) Was appellee entitled to recover from appellants any of the disputed property value thereof?

(4) Was the amount of the judgment awarded against appellants excessive?

## FACTS

The bankrupt, Christian & Porter Aluminum Company (herein "Bankrupt"), is a California corporation. All of the issued and outstanding stock of the corporation was owned by Nick and Menas Christian. Bankrupt had established a line of credit with the United California Bank (herein "UCB") secured by a perfected security agreement which established a lien on the accounts receivable, inventory and general intangibles of Bankrupt as well as its major piece of equipment, an aluminum extrusion press. UCB had made considerable advances to Bankrupt, who was increasingly unable to repay its debts or meet its current obligations.

As a result of these circumstances, Bankrupt negotiated with appellant DeWayne Titus (herein "Titus") for the sale of Bankrupt's stock and business to Titus or one of several corporations owned and controlled by him. On June 14, 1976, an agreement was reached under which Alameda Diversified Industries (herein "ADI") would lease the real property on which Bankrupt did business. It was also agreed that the capital stock of Bankrupt would be transferred to ADI. It is alleged that the stock was to be purchased and further money advanced

pending purchase only on the condition that a settlement was reached between Bankrupt and its creditors. The bankruptcy judge found that at this time Titus promised to pay Nick and Menas Christian $150,000 for their Christian & Porter Stock.

According to appellants, UCB stopped all financing of Bankrupt on June 21, 1968, and called its loan. At this time, there was approximately $70,000 outstanding on the UCB loan for the extrusion press and nearly $150,000 outstanding on other advances by the bank. Other creditors had unpaid demands amounting to about $180,000. The termination of UCB's advances resulted in Bankrupt's inability to meet its on-going expenses; it had approximately $33,000 on hand.

On June 24, 1968, Nick Christian emptied his company's bank account by withdrawing $32,430 and delivered this sum to W. J. Knowles (herein "Knowles"), Titus' attorney. Knowles deposited it in his "trust account."

Appellants recite that on June 27, 1968, attorneys representing Bankrupt and ADI met "with a body of creditors of the aluminum company," and offered them a cash settlement of 25% or, in the alternative, a payment of 100% over a period of four years, with a two-year moratorium. Both alternatives were rejected.

On June 28, 1968, Nick Christian, as president of Bankrupt, executed a security agreement and financing agreements with Harbor Steel, another of Titus' corporations. This financing statement was duly filed the same day. Again, according to appellants' brief, this arrangement exchanged an agreement on the part of Harbor Steel to advance Bankrupt's current operating expenses for a security interest in all of Bankrupt's assets, subject to prior existing liens.

Appellants allege that between June 24, 1968, and July 10, 1968, Harbor Steel advanced approximately $45,000 to Bankrupt;

Steel, Inc.; ABC Container Co., Inc.; Pacific Wood and Metal Enterprises; Bayshore Lift Corporation; U. S. Modular Leasing, Inc.;

Transocean Terminals, Inc.; and Transocean Managing, Inc.

that in this same time period Knowles delivered another $12,000 of Bankrupt's receipts; and that he disbursed "virtually all of the money he had received to creditors and employees of Bankrupt." The bankruptcy court, on the other hand, found "no proof that any money was ever loaned to or paid for the benefit of [Bankrupt], by Titus or Harbor Steel or any other respondent." The court found that the checks issued by Harbor Steel during this interval:

> were paid for the benefit of respondents, then in control of and about to acquire the [Bankrupt's] business and assets; a substantial part of those payments were 'C.O.D.' purchases of inventory that was transferred to and used by respondents in their continuance of [Bankrupt's] business. Most, if not all, of those payments came from the $32,430 of [Bankrupt's] money that was given to Knowles and collections on [Bankrupt's] accounts receivable that respondents received.

According to appellants, on July 10, 1968, UCB demanded payment in full on its notes and placed its receiver in Bankrupt's plant. On the same day, Harbor Steel ceased making advances and also demanded payment in full. When Bankrupt failed to comply, Harbor Steel took possession of Bankrupt's plant on July 12, 1968, claiming to be the creditor in possession under the provisions of the security agreement. Thereafter, the business of Bankrupt was continued in the name of National Building Components (herein "NBC"), a corporation formed by Titus on July 15, 1968. Bankrupt's plant, assets and business were turned over to NBC on the same day.

This transfer of possession, according to appellants, was designated a private sale of the collateral securing Harbor Steel's claim, and a bill of sale was executed to document it. However, the bankruptcy court found:

> No sale or purported sale of any [of Bankrupt's] asset under the provisions of the June 28th security agreement has been made, and there has been no accounting to [Bankrupt of] assets and money acquired by Titus and Harbor Steel and the other respondents.

Immediately after July 17, 1968, Nick and Menas Christian were employed by Titus or his corporations, NBC and ADI.

On July 23, 1968, Titus personally purchased an assignment of UCB's security interest for $212,000, paid for with funds borrowed by Titus from UCB the same day, unsecured. On August 5, 1968, Titus purported to sell to NBC the collateral acquired pursuant to the assignment of the UCB security agreement. According to appellants, the sale was advertised in the newspaper, and all the creditors with claims over $500 were mailed individual notices. The only bid was for $267,000 on behalf of NBC. The price was paid by check, which was, however, never negotiated since it was not funded. Thereafter, NBC operated the aluminum business and collected approximately $202,000 on Bankrupt's old accounts receivable. These funds were used by Titus to repay his loan of $212,000 at UCB.

On August 9, 1968, a creditors' involuntary bankruptcy petition was filed against Bankrupt, and on March 7, 1969, the corporation was adjudicated bankrupt after a contested trial. This order was affirmed by the district court, *In re Christian and Porter Aluminum Company*, 316 F.Supp. 1340 (N.D.Cal.1970), and the Bankrupt's appeal to this court was dismissed on July 27, 1971. On October 23, 1969, the Trustee filed an application with the bankruptcy court seeking an order requiring appellants Titus and his corporations to turn over the assets they had received from the Bankrupt and a temporary restraining order, restraining appellants from transferring any of their assets, *except in the ordinary course of business.* An order to show cause and temporary stay were issued by the court on the same day. Appellants filed an answer and objection to jurisdiction on October 31, 1969. On November 26, 1969, a settlement agreement was executed by the Trustee and appellants, and an order authorizing and approving the compromise and dissolving the restraining order was filed the same day. On May 30, 1970, the Trustee amended his application for a turnover order to allege fraudulent conveyances. On June 15, 1970,

appellants filed another objection to jurisdiction and answer to the allegation of fraudulent conveyances. The initial decision of the bankruptcy court was appealed and referred to a new trial. Judgment in favor of the Trustee and against appellants for $462,039.39 was rendered on August 20, 1974, by the bankruptcy court. On appeal, the district court affirmed the bankruptcy court's judgment.

## I. CAPACITY TO APPEAL

Before dealing with the substantive issues, the procedural issue that must first be resolved is whether the fourteen corporate appellants,[2] who have failed to pay their California Franchise Taxes and have subsequently been "suspended," are precluded from appealing the case at bar.

The capacity of a corporate litigant to sue or be sued in a federal case is directly controlled by Fed.R.Civ.P. 17(b) which provides, in pertinent part, "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it is organized." This rule is explicitly made applicable to bankruptcy proceedings pursuant to Bankruptcy Rule 717, which states that "[e]xcept as provided in Rules 212(f) and 512(d) [not applicable in the present case], Rule 17 of the Federal Rules of Civil Procedure applies in adversary proceedings."

The "local law" which is relevant to the particular facts in the case at bar is California Revenue and Taxation Code § 23301 (herein "Section 23301") which provides, in pertinent part, that "[e]xcept for the purpose of amending the articles of incorporation to set forth a new name, the corporate powers, rights and privileges of a domestic taxpayer shall be suspended [for nonpayment of its franchise tax]."

Read together, it is evident that the corporate appellants who have been suspended, see footnote 2, for nonpayment of franchise taxes are barred from pursuing an appeal of the order from the district court. Such interpretation has similarly been reached in *Mather Construction Company v. United States*, 475 F.2d 1152, 201 Ct.Cl. 219 (1973) and *Weinstock v. Sinatra*, 379 F.Supp. 274 (C.D.Cal.1974). In *Mather, supra*, the court dismissed an action by a contractor to recover on a contract with the Air Force for construction of military housing, because the plaintiff contractor was a California corporation that had been suspended for nonpayment of taxes. The court stated:

> In *Chicago Title & Trust Co. v. Forty-One Thirty Six Wilcox Bldg. Corp.*, 302 U.S. 120, 124–125, 58 S.Ct. 125, 127, 82 L.Ed. 147 (1937), the Supreme Court stated that:
>
>> The decisions of this court are all to the effect that a private corporation in this country can exist only under the express law of the state or sovereignty by which it was created . . . . There must be some statutory authority for the prolongation of its life, even for litigation purposes.
>
> The court's decision was rendered in the same year as the promulgation of Rule 17(b), and although not addressed to the rule itself, has been uniformly interpreted as requiring that federal courts apply the law of the state of incorporation when determining corporate capacity under Rule 17(b). . . .
>
> Under the law of California, a corporation which has been suspended for failure to pay franchise taxes is prohibited from suing, from defending a suit or from appealing from an adverse decision.

475 F.2d at 1154–55 (citations omitted).

Appellants' attempt to distinguish *Mather* by asserting that the case at bar did not arise under exclusive federal jurisdiction but rather was a case involving a claim for money arising under a contract. Such an assertion, however, is clearly erroneous. As

---

2. Transocean Export Packing, Inc.; National Building Components, Inc.; Modulemode Corporation; Continental Consolidated, Inc.; Transocean Enterprises, Inc.; Payrolls, Inc.; Aluminum Extruded Shapes, Inc.; All American Machinery Co., Inc.; Coast Corrugated Container Corporation; Harbor Steel, Inc.; Pacific Wood & Metal Enterprises; Bayshore Lift Corporation; U.S. Modular Leasing, Inc.; and Transocean Managing, Inc.

stated previously, pursuant to Fed.R.Civ.P. 17(b) and Bankruptcy Rule 717, Section 23301 is applicable in a federal bankruptcy matter.

Appellants also contend that since appellee did not plead Section 23301 in the trial court, appellee has waived the section and cannot now assert it on appeal. Appellants' contention is without merit and should be disregarded.

In *Gar-Lo, Inc. v. Prudential Savings and Loan Association*, 41 Cal.App.3d 242, 116 Cal.Rptr. 389 (1974), the court was faced with the same contention raised by appellants. In *Gar-Lo*, the appellant corporation was suspended on or about July 1, 1969, pursuant to Section 23301 for failure to pay its franchise tax. Even so, the appellant filed an action in a superior court on September 3, 1970. On May 13, 1974, summary judgment was entered against the appellant. Consequently, the appellant appealed the superior court's decision to which the appellee responded by moving to dismiss the appeal upon the ground that the appellant corporation had no right to appeal pursuant to Section 23301. In opposition, appellant argued its lack of capacity to sue could only be raised by a plea in abatement, and appellee waived the defense by failing to raise it in the trial court "at the earliest opportunity." The court held for the appellee and stated as follows:

> It is true that a defense based upon such a suspension of corporate powers is a species of plea of abatement and that a suspended corporation which pays its taxes and obtains a certificate of revivor during the pendency of an action may be allowed to carry on the litigation, even to the extent of validating otherwise invalid prior proceedings. The purpose of the suspension is to induce the payment of taxes. 'There is little purpose in imposing additional penalties after the taxes have been paid.'

> . . . . . .

Here we have a corporation which indicates no intention to pay its delinquent franchise taxes. It claims, in effect, that it has acquired an irrevocable license to carry on litigation in this court in defiance of Section 23301, by reason of respondent's failure to object in the trial court, 'at the earliest opportunity presented.' Appellant's argument overlooks the main purpose of the statutory suspension is to collect a tax, and that respondent is only an incidental beneficiary of that law. We do not believe the statute can be construed to give the appellant the benefit it claims.

41 Cal.App.3d at 244, 116 Cal.Rptr. at 390 (citations omitted).

The holding in *Gar-Lo* rests upon sound judicial reasoning as to hold otherwise would vitiate the underlying legitimate purpose for which Section 23301 was enacted, i. e., to collect taxes.

Accordingly, the appeals by those fourteen corporate appellants, who have failed to pay their franchise taxes and have subsequently been suspended, are dismissed.[3]

## II. JURISDICTION

Appellants contend that the bankruptcy court lacked summary jurisdiction to proceed against them.

The principle is well-established that the bankruptcy court has summary jurisdiction to adjudicate all rights and claims pertaining to property which is in the actual or constructive possession of the Trustee. However,

> [w]here the controversy is one involving property in the actual or constructive possession of a third person asserting a *bona fide* adverse claim, the bankruptcy court has no jurisdiction to determine summarily that person's claim upon petition by the receiver or trustee, *unless by that person's consent.* Without the consent of the adverse claimant, a plenary suit must be brought in the court of appropriate jurisdiction . . . . .

---

**3.** The remaining appellants who can pursue their appeal are Titus, ABC Container Co., Inc., California Western Trucking, Dee-Jay Holding, Inc., Barbary Coast Properties, Inc., Transocean Terminals, Inc., and Modular Construction and Development.

2 Collier on Bankruptcy, ¶ 23.04[2] (emphasis added). *See, Magnolia Petroleum Co. v. Thompson*, 106 F.2d 217, 222 (8th Cir. 1939), *rev'd on other grounds, Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). Appellants urge that their adverse claim to the Bankrupt's assets precludes summary jurisdiction in the bankruptcy court.

Their argument hinges, however, on the question of consent. The settlement agreement filed on November 26, 1969, specifically provides for the payment by Titus of "any and all claims, obligations or liabilities" which the bankruptcy court found were owed by Titus or his corporations to the receiver or the bankruptcy estate of Bankrupt, "it being specifically understood and agreed that the validity of any such claims, obligations, or liabilities shall be fixed and determined by the Bankruptcy Court after due hearing upon notice to the parties hereto."

Appellants contend that this consent to summary bankruptcy jurisdiction is invalid because (a) it "was the obvious product of coercion"; (b) "it has not been judicially noticed"; and (c) there were pending petitions for review from March 17, 1969, to August 16, 1971, at the time the restraining order and order approving the settlement were entered.

### A.

Appellants cite *First National Bank of Cincinnati v. Pepper*, 454 F.2d 626 (2nd Cir. 1972), for the proposition that "a settlement contract or agreement, like any other, may be attacked on the grounds that it was procured by fraud, duress or other unlawful means." 454 F.2d at 632. The asserted "duress" under which the consent was given was the October 23, 1969 temporary restraining order, which prohibited appellants from transferring, encumbering, and/or conveying any of their assets in aid of DeWayne F. Titus to hinder or delay the recovery of assets by said receiver, save and except transactions involving the sale of merchandise in the usual course of business . . . . .

Appellants' argument, however, is without merit. First, appellants' assertion that "clearly this [order] would stop all business" is obviously exaggerated. The order explicitly permits the continuation of the company's business operations; it merely stops the kind of rapid transfer of assets which had been taking place between various of Titus' operations.

More importantly, however, only *unlawful* pressures on a party can constitute duress. As stated in the case cited by appellants, "it cannot be duress for a party to insist upon his legal rights." *Pepper, supra* at 633. Appellants argue that the restraining order which assertedly coerced it into executing the settlement agreement was "highly improper and unlawful," because it was issued at a time that the bankruptcy court had no jurisdiction over the appellants. However, it is clear that the bankruptcy court did have jurisdiction to issue the temporary stay for the purpose of protecting the Bankrupt's assets while it decided the issue of whether it had summary jurisdiction. In the case of *In re American Fidelity Corporation*, 28 F.Supp. 462 (S.D. Cal.1939), the court stated the general rules relating to bankruptcy jurisdiction:

All property in the actual or constructive possession of the bankrupt, in which he claims an interest, passes upon the filing of the petition in bankruptcy, into the custody of the bankruptcy court. *To protect its jurisdiction from interference, that court may issue an injunction and determine, preliminarily, all questions concerning possession; and, for that purpose, may even go into the merits of the controversy to determine whether or not the bankruptcy court has acquired possession, actual or constructive.*

28 F.Supp. at 467 (emphasis added). *Accord, In re Abraham*, 421 F.2d 226, 227–228 (5th Cir. 1970); *Wasserman v. Driscoll*, 282 F.2d 502 (1st Cir. 1960). In *Taubel-Scott-Kitzmiller Co. v. Fox*, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770 (1924), Justice Brandeis stated the principle:

As every court must have power to determine, in the first instance, whether it has

jurisdiction to proceed, the bankruptcy court has, in every case, jurisdiction to determine whether it has possession actual or constructive. It may conclude, where it lacks actual possession, that the physical possession held by some other persons is of such a nature that the property is constructively within the possession of the court.

264 U.S. at 433, 44 S.Ct. at 399 (footnotes omitted).

Since the bankruptcy court had jurisdiction to issue the temporary stay while it determined whether or not it had summary jurisdiction over appellants, there was nothing unlawful about the issuance of the restraining order or its effect on appellants' commercial operations. However coercive its effect, the order did not constitute duress. Thus, appellants' stipulated consent to the bankruptcy court's jurisdiction was valid and binding.

> Consent having been given, it may not subsequently be withdrawn by a party; nor may the party, upon appeal from the decision, raise the question of want of jurisdiction.

2 Collier on Bankruptcy ¶ 23.08[1] (footnotes omitted).

### B.

■ Appellants next urge that even if the settlement agreement is valid, it was not properly admitted under rules of judicial notice. Appellants acknowledge that the Trustee filed the settlement agreement with the bankruptcy court on November 26, 1969, as a pleading. It is in the record.

A trial court may take cognizance of a written stipulation made and filed in the case being tried. The cases and arguments cited by appellants in support of their position are simply not on point. They deal with situations in which a court either improperly relied on material not introduced in that litigation but filed in a *different* proceeding, e. g., *Interstate Commerce Commission v. Louisville & Nashville R. Co.*, 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431 (1913); *In re Aughenbaugh*, 125 F.2d 887, 889–890 (3rd Cir. 1942); or else relied on

material obtained informally, in an entirely non-judicial manner. *In re Lenrick Sales, Inc.*, 369 F.2d 439, 442 (3d Cir. 1967). *The issue of judicial notice is entirely inapposite.* Stipulations are treated as judicial admissions. 9 Wigmore on Evidence (3d Ed.) § 2588 at 581.

### C.

Appellants argue that everything in the record dated from March 17, 1969, through August 16, 1971, during which time the order of bankruptcy adjudication and initial order of July 30, 1970 were still on appeal, "should be branded as meaningless documents, for want of jurisdiction."

■ The general rule that a properly filed notice of appeal deprives the trial court of jurisdiction to proceed further except by leave of the appellate court does not apply in bankruptcy proceedings. Appellants' contention to the contrary is refuted by the very case they cite:

> [P]roceedings in bankruptcy should not halt merely because interlocutory orders are appealed from the referee . . . [rather,] a case should continue to be adjudicated on the merits by the referee unless the order appealed from was of such a nature as to render further proceedings useless.

*Mavity v. Associates Discount Corporation*, 320 F.2d 133, 136 (5th Cir. 1963).

■ The Trustee in a bankruptcy proceeding is expected and encouraged to proceed with administration of the estate after the entry and during the appeal of an order of adjudication. *Georgia Jewelers, Inc. v. Bulova Watch Co.*, 302 F.2d 362, 370 (5th Cir. 1962).

In sum, appellants' jurisdictional arguments are without merit. The settlement agreement constituted valid consent to summary bankruptcy jurisdiction.

### III. FRAUDULENT CONVEYANCES

On the merits, appellants urge that (a) the referee improperly previewed all documents in the case before they were offered

in evidence; (b) the record does not support the finding that the transfers of Bankrupt's assets to appellants were fraudulent; and (c) the record does not support the finding that all corporate appellants are alter egos of DeWayne F. Titus.

## A.

 With regard to appellants' first argument, this issue was not raised in either the bankruptcy court or in the district court on review. It cannot now be raised on appeal. In any event, a summary proceeding in bankruptcy is by definition less formal than a plenary proceeding. 2 Collier on Bankruptcy, ¶ 23.02[2]; Nadler, Bankruptcy, §§ 599, 600 (2d Ed.). Appellants can hardly be said to have been prejudiced by the fact that the referee saw all the evidence before it was offered, since he would have to have seen it at the time it was offered anyway in order to rule on its admissibility.

## B.

 Appellants bear the burden of establishing that the findings are clearly erroneous, in that there was no substantial basis in the evidence to sustain the findings and that failure to reverse the judgment would result in a miscarriage of justice. *Engstrom v. Wiley*, 191 F.2d 684 (9th Cir. 1951); Nadler, Bankruptcy, § 36a (2d Ed.). The district court below simply affirmed the referee's judgment without written opinion. At the hearing, Judge Schnacke stated to appellants' counsel:

I can understand that you feel strongly that the facts are different from those that are found by the Referee, but we here are limited to looking at those factual findings and then looking to the record which I am sure you agree it [sic] is full of factual disputes and the bulk of those disputes were resolved against you. So we are now taking the record as we find it and by and large I find that it is pretty well supported by the findings, pretty well supported by the record and based upon the findings, I find little difficulty in approving the conclusion of law that resulted.

 This court must look to the evidence before the referee to determine the correctness of the district court order appealed from. *Controller of California v. Lockwood*, 193 F.2d 169, 171 (9th Cir. 1951).

 Referee Gillard found that the series of transactions between June 14, 1968 and July 12, 1968, whereby the assets of Bankrupt were transferred to Titus and his companies, were fraudulent, within the meaning of all four subsections of § 67d(2) of the Bankruptcy Act, 11 U.S.C. § 107(d)(2).[4] Specifically, the bankruptcy court found that the transfers, which were performed within the statutory limit of one year prior to the filing of the creditors' bankruptcy petition, were made without fair consideration by an insolvent and with actual intent to hinder, delay or defraud the creditors of Bankrupt. Thus, the referee found both actual and constructive fraud on the part of the Bankrupt and the appellants. In order to uphold the judgment voiding the transfers as fraudulent, it is only necessary to find *either* that there was no fair consideration given and Bankrupt was or was thereby rendered insolvent; *or,* that there was actual intent to hinder, de-

---

4. "(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction[s], for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent; or (c) as to then existing and future creditors, if made or incurred without fair consideration by a debtor who intends to incur or believes that he will incur debts beyond his ability to pay as they mature; or (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors." 11 U.S.C. § 107(d)(2).

lay or defraud creditors. 4 Collier on Bankruptcy, ¶ 67.34[3].

Appellants have failed to show that the decisions below were clearly erroneous and unsupported by substantial evidence. Central to the appellants' argument is the contention that Titus was protected by a valid security agreement filed June 28, 1968, and that all the transfers of Bankrupt's assets, thereafter, were merely legal foreclosures on collateral. However, § 67d(1)(e) of the Bankruptcy Act, 11 U.S.C. § 107(d)(1)(e) provides as follows:

> (e) Consideration given for the property or obligation of a debtor is 'fair' . . . when such property or obligation is received *in good faith* to secure a present advance or antecedent debt *in an amount not disproportionately small* as compared with the value of the property or obligation obtained. (Emphasis added).

In this case, there is ample evidence from which the referee could conclude that the value of the security interest taken by Titus was disproportionately large compared with the consideration given to Bankrupt and that the arrangement was not made in good faith. "Fairness in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." 2 Collier on Bankruptcy, ¶ 67.33

The initial June 14, 1968 lease to Titus' interests of the real property on which Bankrupt did business was obviously of no benefit to Bankrupt. It was advantageous to Nick and Menas Christian, who as the partners of NMH Enterprises, the lessor, obtained a solvent lessee in the person of Titus; and it provided Titus with "a 10-year rent free facility to conduct the business," since Titus would collect rent from a sublessor which would more than cover his rental payments to NMH Enterprises. Although appellants assert that this lease "was subject to a creditor compromise which was never effected," the lease contains no such condition. While ADI may never have taken possession of the premises, NBC certainly did after the company was newly formed on July 15, 1968, to operate Bankrupt's business.

The matter of Nick Christian's withdrawal of all of Bankrupt's commercial bank account and the delivery of the $32,430 cash balance to the attorney representing Titus is obviously suspicious. Appellant argues that this money was used to pay wages and for the purchase of raw materials for Bankrupt. The evidence does not support this. Most of the money was paid directly to Harbor Steel, Titus' company.

With regard to the June 28, 1968 security agreement, appellants assert that Titus was simply trying to help Bankrupt stay afloat by promising to advance funds in return for a security interest in all of the assets of the company, subject to prior liens. Appellants' opening brief argues:

> With the prior liens existing, creditor pressure on the company, and the inability to do business without the Harbor advances, it was not unreasonable to secure the advances with what was left of Bankrupt's equity in its assets. No one then knew how much money Harbor might have to spend.

In view of Bankrupt's obviously desperate financial circumstances at the time, it is difficult to perceive how Titus could have in good faith expected Bankrupt to get back on its feet. In only eleven days, it had collapsed, and Titus moved in to "foreclose" on his security interest. The referee could well have found that Titus "knew or should have known that he was not trading normally but that on the contrary, the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors." Glenn, Fraudulent Conveyances (1931) § 295; quoted in 2 Collier on Bankruptcy, ¶ 67.33, n.5. As appellants concede, "the security agreement for Harbor was made at a time when already the threat of dispossession, or folding up by creditor pressure, was imminent." Indeed, Titus' attorney testified that the Christians and Titus had agreed *in advance* of drawing up any security agreement that Titus would in fact "foreclose" on Bankrupt and take over the business.

The referee found that there was no proof that any money was ever loaned to or paid for the benefit of Bankrupt by Titus or Harbor Steel, or any other appellant. Appellants contend that Harbor Steel advanced about $45,000 to Bankrupt. However, the evidence is ambiguous on this point. Bankrupt was not the payee on any of the checks drawn on Harbor Steel's account; rather, the payments which appellants claim were made by Harbor Steel on behalf of Bankrupt were all to other individuals, and Knowles' only knowledge of what Harbor Steel did for Bankrupt was received from Titus or his employees. Indeed, Knowles testified that he had "no knowledge of any payment whatsoever" by Harbor Steel to Bankrupt. Apparently, at least some of the checks drawn by Harbor Steel to Bankrupt's supplier were actually in payment for C.O.D. purchases of inventory transferred to and used by Harbor Steel during its operation of Bankrupt's business after foreclosure.

On July 15, 1968, the entire plant, business and assets of Bankrupt under Harbor Steel's control were transferred to NBC for the consideration of $1.00. Knowles testified that he had been "much distressed" about the irregularity of the "sale" of Bankrupt's assets to NBC since it was without consideration or documentation for several months after it took place. Bankrupt's business was carried on essentially the same as before, but under the new name, and Nick and Menas Christian immediately became employees of Titus. Complete control over Bankrupt's assets was obtained when Titus personally purchased the security interest of UCB for $212,000 and then "sold it" to NBC for an unfunded $267,000 check which was never negotiated. In this way, the Bankrupt's debt to UCB was satisfied by Titus while all other creditors were effectively cut out.

The beneficiaries of these transfers of Bankrupt's assets and business were Titus and the Christians; Bankrupt itself and its creditors received little if any proven benefit. Transfers made to benefit third parties are not made for "fair" considera-tion. "A general assignment of a debtor's property must be considered fraudulent if not made solely for the benefit of creditors or if designed to postpone liquidation for the benefit of the assignor." 4 Collier on Bankruptcy, ¶ 67.33. *Cf. Buffum v. Peter Barceloux Co.,* 289 U.S. 227, 53 S.Ct. 539, 77 L.Ed. 1140 (1933); *Lesser v. Jewel Factors Corp.,* 470 F.2d 108 (2d Cir. 1972); *Bullard v. Aluminum Company of America,* 468 F.2d 11 (7th Cir. 1972); *Hines Western Pine Co. v. First Nat. Bank of Chicago,* 61 F.2d 503 (7th Cir. 1932). There is ample evidence to support the bankruptcy court's finding of fraudulent conveyances, whether with actual intent to hinder, delay or defraud creditors, or with constructive intent inferred from the lack of fair consideration.

### C.

Appellants challenge the finding that any of them beyond Harbor Steel and NBC is or was an alter ego of Titus. They argue that there is no evidence that any of Bankrupt's assets were ever in the hands of these corporations; that no unity of interest and ownership between Titus and the other appellant corporations was proven; and that it was never shown that recognizing the corporate status of these entities would sanction fraud and promote injustice.

It is well-settled that a bankruptcy judge's alter ego findings can only be set aside if "clearly erroneous." *In re Eufaula Enterprises, Inc.,* 565 F.2d 1157 (10th Cir. 1977); *McConnell v. Estate of Butler,* 402 F.2d 363 (9th Cir. 1968). "Due regard must be given to the opportunity of the referee to judge the credibility of the witness." *In re Eufaula Enterprises, Inc., supra* at 1160.

In applying the "clearly erroneous" test, a question arises as to who bears the burden of proof on the alter ego issue. There appears to be no special federal rule concerning the burden of proof in alter ego cases. Consequently, California law concerning the alter ego doctrine should be applied in the present action. *See,* 1A, Pt. 2 Moore's Federal Practice ¶ 0.314[2].

■ California law provides that the party seeking to have the corporate entity disregarded has the burden of proving that the alter ego theory should be applied. *MacPherson v. Eccleston,* 190 Cal.App.2d 24, 11 Cal.Rptr. 671 (1961); *Platt v. Billingsley,* 234 Cal.App.2d 577, 44 Cal.Rptr. 476 (1965). Thus, in the bankruptcy court, the appellee herein had the burden of proving that the appellant corporations were alter egos of each other and of Titus.

The standard applied in adjudicating alter ego disputes is stated in Ballantine & Sterling California Corporation Laws, 1977 Edition, Sections 295–298.01. Section 297.-02 provides the basic test (as summarized by appellants' supplementary brief):

§ 297.01

The basic rule is that two requirements must be established before the corporate entity will be disregarded:

(1) That there was such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and

(2) That, if the acts are treated as those of the corporation alone, an inequitable result will follow.

Whether these requirements are satisfied is a question of fact and not of law, and the decision of the trial court will not be disturbed if there is substantial evidence to support it.

§ 297.02 Unity of Interest and Ownership Requirement.

The first requirement, that of unity of interest and ownership, has been described as follows:

'Before the acts and obligations of a corporation can be legally recognized as those of a particular person, and vice versa, [it] . . . must be made to appear . . . that the corporation is not only influenced and governed by that person, but that there is such unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased . . . .'

§ 297.03 Requirement That If Doctrine Not Applied Result Will Be Inequitable.

The ultimate test to be applied to meet the second requirement mentioned in § 297.01, *supra,* that an inequitable result will follow if the alter ego doctrine is not applied, is whether recognition of the corporate entity will open the door to fraud or promote injustice.

It is important to note that the application of the doctrine does not depend on the presence of actual fraud since the cause of action and remedy sought may have nothing to do with fraud.

Applying the alter ego standard to the evidence in the record, the conclusion that must be reached is that the bankruptcy court clearly erred in imposing liability against appellants ABC Container Co., Inc., California Western Trucking, Dee-Jay Holding, Inc., Barbary Coast Properties and Transocean Terminals, Inc. There is simply no evidence in the record to meet the "unity of interest" criterion. Almost all the evidence in the record on this issue comes from the testimony of Titus. There is nothing in the record to dispute his contention that the bankruptcy court erred on this issue. Appellee states that:

The Titus testimony, at pages 459 to 494 and 508 to 525 of the reporter's transcript, is too lengthy to summarize for each of the twenty corporations and shifting assets between them to avoid paying creditors, was made abundantly clear.

■ The "unity of interest" criterion, however, cannot be met simply by alleging a pattern of corporate transaction. Rather, some concrete evidence of ownership or interest must be alleged and established by the appellee. *

■ Aside from the fact that there is no evidence that Titus owned or controlled these corporations, there is no showing whatsoever that any of these corporations were used by Titus in taking Bankrupt's assets or had ever received any of the transferred property. This was admitted by the

Trustee in his arguments in the district court.

In *Elliott v. Glushon,* 390 F.2d 514 (9th Cir. 1967), this court specifically held that trustees' actions under sections 67, 70(e), and 60(b) of the Bankruptcy Act are limited to recovery against persons who have "received" the property in question. An earlier case, *Brainard v. Cohn,* 8 F.2d 13 (9th Cir. 1925), which held that the trustee could recover from a conspirator the value of all property involved in a fraud, was limited to the situation where the goods in question had allegedly been intermixed with identical property of certain conspirators, making identification impossible. In *Elliott,* this court reasoned that in view of the purposes and the specific language of the Bankruptcy Act, only those persons who received some of the property involved in an allegedly voidable transaction would be subject to recovery. *Elliott v. Glushon, supra* at 515–517. This is clearly applicable to the instant case, in which, as appellee concedes, there is nothing to indicate that any of the corporate appellants[5] had anything to do with the transfer of Bankrupt's assets.

Accordingly, judgment is reversed as to ABC Container Co., Inc., California Western Trucking, Dee-Jay Holding, Inc., Barbary Coast Properties, Inc., and Transocean Terminals, Inc.

The alter ego contention of appellants, however, is without merit as to appellant Modular Construction and Development (formerly ADI). "He [Titus] owned all of the stock and divided his time between its [Modular Construction and Development] affairs and those of Transocean Export Packing." Appellants' Supplemental Brief at 5. This fact alone would form some basis for finding the requisite "unity of interest" and would support the bankruptcy court's decision applying the "clearly erroneous standard."

## IV. AMOUNT OF JUDGMENT

Finally, appellants urge that the amount of the judgment awarded to the Trustee was excessive. Their arguments are unpersuasive.

They urge that all but $3,460 of the $32,-430 in the Knowles trustee account was used to pay the Bankrupt's debts. There is no evidence to support this. Knowles testified that most of the money was given to Harbor Steel; however, he did not know why the money was given to Harbor Steel or what that company, wholly owned by Titus or his affiliates, did with the money. Appellants next argue that the value of Bankrupt's accounts receivable transferred to them should be returned in kind, rather than at the referee's valuation of how much appellants had collected on them. However, they are obviously valueless now and were at the time of trial in 1973, five years after Titus took possession of them. Appellants also contend that the value of Bankrupt's equipment should have been put at $68,699 rather than $146,102, because some of it was sold for the lower amount years after it was taken by Titus. No evidence is cited to support this reduction.

Appellants took over the Bankrupt's business, used and sold the inventory, and eventually sold all of the assets taken. Titus was not forthcoming in producing evidence or accounting for the proceeds of these assets. Instead, he supposedly offered to return the remaining property to the Trustee, after it had been largely used up or depreciated in value. The burden of proof is clearly on the fraudulent grantee to establish the amount of assets transferred, if the assets are entirely under its control and unavailable to the Trustee. *McWilliams v. Edmonson,* 162 F.2d 454 (5th Cir. 1947); *Manufacturers' Finance Co. v. Marks,* 142 F.2d 521 (6th Cir. 1944). When the transferred property cannot be completely recovered, the Trustee in a § 67d case may recover the fair market value of the property at the time of transfer plus the intervening income or interest. 4 Col-

---

5. Exceptions being Harbor Steel, Inc., NBC, and Modular Construction and Development (formerly ADI).

lier on Bankruptcy, ¶ 64.49. In this case, the trial court's findings of value were based on the best available evidence (Trustee's Exhibits 26, 36, 43, 61 and 72).

Judgment is hereby affirmed as to appellants Titus and Modular Construction and Development (formerly ADI) and, as stated previously, reversed as to appellants ABC Container Co., Inc., California Western Trucking, Dee-Jay Holding, Inc., Barbary Coast Properties, Inc., and Transocean Terminals, Inc.